## BLAIR *v.* BLAIR
[No. 53, October Term, 1951.]

*Decided January 9, 1952.*

10

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Milton Gerson*, with whom was *Harold Naughton* on the brief, for the appellant.

*Edward J. Ryan* with whom was *William L. Wilson, Jr.*, on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

This is an appeal by a wife from a decree of divorce *a mensa et thoro* granted her husband by the Circuit Court for Allegany County. In the decree the custody of an infant child was given to the wife without liability on the part of the husband to contribute toward its support. The chancellor reserved a division of the personal property under Sec. 42A of Article 16 of the Code for subsequent decision, and later decreed that the wife should have the household furniture and the proceeds of the joint bank account, less counsel fees and court costs, and less the amount of $1,172.74. The husband was given the automobile and this sum of $1,172.74 which was to be paid him by the wife. The decision of the court on this last point was based upon its finding that four-sevenths of the deposits in this account were made by her, and three-sevenths by him, and the division was placed upon this basis.

Sec. 42A of Article 16, enacted by Chapter 220 of the Laws of 1947, authorizes a court to hear and determine all questions which may arise between the parties to a

divorce proceeding in connection with the ownership of personal property, and to make division of such property, but this authority is confined to cases when a divorce either *a mensa et thoro* or *a vinculo matrimonii* has been granted. The primary question before us in this case, therefore, is whether the husband should have been granted a divorce, because if this action was incorrect, then there was no power in the court to pass the further decree dividing the property.

The facts in this case show it not only to have been a marriage contracted in wartime, but also that by apparent agreed and understood intention, it was one of those very modern marriages, of late years quite common, in which both husband and wife continue to be employed outside of the home. These modern marriages have created many new matrimonial problems, and some of the previous rulings, based upon older customs, may be inapplicable to them.

The parties were married on June 19, 1945, when the husband was in the armed forces of the United States, stationed at Bolling Field, Washington, D. C. His entire income was his pay, which was $96.00 a month. The wife was employed at the Celanese Corporation plant at Amcelle, Allegany County, Maryland, and earned about $225.00 a month. As soon as they were married, a joint bank account was started, but the parties were unable to live together until October, 1945, when the husband was discharged from the army. He then returned to Allegany County, and lived with his wife at her parents' home until February, 1946. During this time, he also worked for the Celanese Corporation. In February, 1946, he enrolled at the University of Maryland at College Park, Maryland, under the G. I. Bill of Rights, and his income became $90.00 a month. His wife remained in Allegany County and continued to work for the Celanese Corporation. In 1946, the husband also joined in operating a small business on the university campus and received some four hundred-odd dollars from this. He continued to attend the University of Maryland

in 1947, and made some six hundred-odd dollars in that year from the store which he operated there. He did the same thing in 1948, earing eight hundred-odd dollars from the store. In the latter part of that year, he worked for the Firestone Tire & Rubber Company in Baltimore, and lived at the Y.M.C.A. there. He then earned $250.00 a month. This continued until July, 1949. From August to December, 1949, he worked for the Hecht Company in Baltimore. When he started to work for this last employer, his wife gave up her job in Allegany County, and came to Baltimore to live with him. In the year 1950, the husband returned to the University of Maryland, and he and his wife started housekeeping in Mt. Rainier, Maryland, which is not far from the University. In June of that year, he went to Frostburg to see his wife who had returned there for a visit to her parents. She then told him she was going to move the furniture to Frostburg and that she was going back to her old job at the Celanese plant. He apparently objected to this, but, on July 19 or 20, 1950, the wife came to Mt. Rainier with her father, and, on the following day, removed the furniture to Frostburg. The husband continued at College Park at summer school until August. He then went to Frostburg and lived with his wife at her parents' home for thirteen days, occupying the same room. On August 17, 1950, the separation occurred, and the decree of the court was based upon this separation.

Before discussing what happened on August 17, 1950, it may be noted that the wife earned after her marriage $1,101.43 in 1945, $2,304.88 in 1946, $2,758.50 in 1947, and $1,966.49 in 1948. In 1949, she earned $414.00 and received $600.00 unemployment compensation. In 1949 she worked three weeks in Washington and received $73.99, and, in 1950, until the date of the separation, she earned $412.70. Her total income, therefore, from the date of the marriage to the date of the separation was $9,631.99. It is impossible, and, in view of our conclusion in the case, unnecessary, to audit the bank account of these parties, but apparently deposits were made in it by

both of them, and out of it furniture was bought, a car was bought, and legitimate family expenses were paid. At the time of the separation, there was over $4,000.00 in the bank.

This marriage represents a praiseworthy effort on the part of two people to work out together their financial problems, and these necessitated, at times at least, their living in different places. The husband obviously could not support his wife on his G. I. allowance, and she had a very good position from which she could make money enough to support herself and take care of his needs and those of the child, 2½ years old at the time of the hearing. The husband seems to have contributed from his earnings in the intervals when he was not attending school. The family purpose evidently was to permit the husband to get an education and thereby fit himself for advancement in the world. This he did, and, according to a statement made at the argument before us, he is now employed as a teacher in the high school in Frostburg. It is extremely unfortunate that a marriage started as this one was, with the apparent intention of both parties to work toward a definite goal, should break up at the time the goal had been reached, or was in sight. However, it is not our duty to moralize about this. What we have to do is to find out whether there was a sound basis for the chancellor's decree which adjudged the wife to be in fault.

What happened was that in August, 1950, when the husband was living with his wife at her parents' home, he went to the bank in Frostburg where the joint account was kept, and inquired what was the amount of it and how it could be withdrawn. The wife had always conducted all the financial arrangements, and had the pass book which was necessary for a withdrawal. Then, on August 17, the husband took the little son to see his paternal grandmother, who also lived in Frostburg. One or both of these actions apparently greatly angered the wife, although her testimony is not at all clear as to which was the controlling factor. When the husband

brought the little boy back from the visit to the grandmother, his wife was sitting in front of the house, and she ordered him to put the child down. He asked her to go into the house to talk matters over, but she refused, and her parents, who came out, refused to interfere. It does not appear that he was then ordered or requested by either his wife or her parents to leave. He did, however, go to the office of his attorney in Frostburg, who thereupon called the wife to come to his office to talk matters over. She went there and apparently the lawyer asked both of them whether they were willing to continue to live together, and both of them then replied in the negative. The wife says the question was put to the husband first. The husband is not certain that the question was put to him. In any event, no agreement was reached and thereupon the husband filed the bill for divorce.

In the bill the husband alleged a desertion which occurred on the 19th day of July, 1950, which was the date when the wife took the furniture from Mt. Rainier to Frostburg. It may be doubted, however, whether this could be considered a desertion by her in any event. While it has been generally held that the husband has the right to choose the family domicile, and the wife must follow where he chooses to go, this "is correlative with the husband's duty to provide for the support and maintenance of his wife and family." *Hoffhines v. Hoffhines,* 146 Md. 350, 357, 126 A. 112, 115, 38 A. L. R. 332. See also *Schwartz v. Schwartz,* 158 Md. 80, 91, 148 A. 259; *Buttion v. Buttion,* 189 Md. 305, 310, 55 A. 2d 839; and *Thomas v. Thomas,* 197 Md. 15, 21, 78 A. 2d 225, 228. That rule was based upon the fact that the husband earned the money for the support of the family, and, therefore, had the right to decide where the family should live, so that he could best fulfill this obligation, but where the wife also works, and where in some cases, as in the one before us, she earns more than he does, the reason for the rule no longer exists, and it cannot be equitably enforced. However, in this case, the parties

afterwards lived together in Frostburg, after the wife had left Mt. Rainier. The chancellor found the desertion occurred on August 17 in Frostburg, when the events took place which we have related.

We have said many times that divorces should not be granted except for weighty reasons. A quarrel or disagreement of uncertain origin which causes both parties, in the heat of the dispute, or immediately thereafter, to decline to continue the marital relationship, is not a grave or weighty reason for granting a divorce. We are not unmindful of our long consistent rule that where the chancellor has seen and heard the parties, we will not disturb his findings of fact unless they are clearly erroneous, but in this case, it is not a question of fact but a question of intention to be derived from established facts. Giving full weight to the husband's testimony, and disregarding the contradictions of the wife, it does not appear that the wife ever deserted him, or ordered him away, or refused to live with him, until the meeting at the lawyer's office, which certainly was not a time, or under circumstances, calculated to make her feel like making up the quarrel which had just occurred. She did decline to live with her husband at that meeting, but she was angry because of the inquiry at the bank, and because of the taking of the child to see its grandmother with whom she had had some dispute, and not improbably because of being haled to the lawyer's office, and she claimed that she did not leave her husband but that he had left her. The evidence does not show that she left her husband or ordered him out of her parents' home. Her refusal to become reconciled under the circumstances, whatever the effect of that might have been on their future living together, cannot be said to have been made with the deliberate intention of ending the marriage relation. It was a spontaneous outburst by an angry woman who thought her husband was trying to get rid of her, or at least thought he was trying to get the family money, which, up to that point, had

been kept in the joint bank account. She promptly withdrew this money after she learned that he had been inquiring about it.

We cannot find from these facts that there was an intention on her part to desert her husband, and, therefore, we cannot approve the action of the chancellor in granting him a divorce.

*Decree reversed with costs.*