## BISEL *v.* BISEL

[No. 2, October Term, 1953.]

*Decided November 5, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Robert E. Bullard* for the appellant.

*G. Gregg Everngam,* with whom was *Carlos L. Gartrell* on the brief, for the appellee.

SOBELOFF, C. J., delivered the opinion of the Court.

This is an appeal by a wife from a decree dismissing her bill of complaint for a divorce *a mensa* for desertion. A similar bill by the husband against the wife was also filed, and dismissed by the Court, but from this action no appeal was taken.

Testimony was taken before an Examiner, and the case was decided by the Chancellor upon the transcript. He did not have the advantage of seeing the parties and their witnesses, and this court is therefore not in a less favorable position than the Chancellor to judge the credibility of the witnesses and to determine the weight to be given to their testimony.

When the parties were married in February, 1950, the husband was 22 years of age and the wife 18. The husband and the wife both worked, but when she became pregnant her employment was terminated. Their daughter was born the following January.

The parties lived in Takoma Park from the time of their marriage till June, 1950, when they purchased in their joint names a house in Silver Spring. Their equity in the property seems to be small. For reasons not apparent in the record they did not immediately move into the house, and for four months, until October 1, 1950, they lived with the wife's mother in Washington. From then, however, until February 14, 1951, they did live in their Silver Spring home. A few weeks after the birth of their child the husband was ordered to return to duty in the Navy. His services were performed chiefly in Philadelphia, and he was discharged in June, 1952.

About the time the husband went into the Navy he turned over the Silver Spring home to his father who, together with his eight children, occupied the place.

During the son's absence the father assisted in making the mortgage payments. The appellant protested this arrangement, but it seems to have been carried out despite her failure to sign a deed or any other papers. She thereupon returned to her mother's home in Washington. The appellee, however, visited her there from time to time.

In March, 1951, according to the appellee's testimony, he made arrangements to rent an apartment in a public housing project in Philadelphia, in close proximity to his station, and he invited his wife and daughter to live with him there. The wife's version was that while the husband told her that he could find quarters in Philadelphia, he had never told her that he had actually found them or even looked for them. At all events, the wife testified, "I couldn't see going because I had no security whatsoever, had no place to go and knew no one there, and Susan was so young, I couldn't take her, and when I was at my mother's we had a roof over our heads and I could depend on her, which I had done many times." The Chancellor characterized the evidence as far from convincing that the husband could have supported his wife and child in Philadelphia, and he held the wife not guilty of desertion in failing to leave her mother's home to go to the insecurity and uncertainties that would have awaited her in Philadelphia. *Cf. Hoffhines v. Hoffhines*, 146 Md. 350, 357, 126 A. 112, 115; *Bennett v. Bennett*, 197 Md. 408, 79 A. 2d 513; *Blair v. Blair*, 199 Md. 9, 14, 85 A. 2d 442. 445; *Smoot v. Smoot*, 200 Md. 216, 88 A. 2d 465.

In the latter part of the summer the wife, accompanied by the child, went to Detroit to visit friends of her mother. On one of the husband's visits to Washington to see the wife he learned that she was in Detroit. He telephoned her to come home (her mother's house), and when she declined he offered to go to Detroit, but she told him not to come. Her explanation is that "the way he talked, I refused to come home, yes. The

main reason was because I couldn't get home. I was waiting for my mother to come get me."

There had been an earlier occasion, according to the husband, when the wife indicated a preference for living apart. Shortly before she left for Detroit the husband had a short leave and offered to join his wife at her mother's home, but she told him not to come. Indeed, it was testified without contradiction that she insisted that he should not visit her without first telephoning.

So far as the testimony discloses, matters seemed to drift until November, when the husband learned that during his absence the wife had some correspondence with a marine. The record contains none of her letters and only one of the marine's. Expressed in words and symbols intended to be endearing, it is quite banal and puerile. While it might well arouse a husband's suspicion and jealousy, it seems to be not actually incriminating. We agree with the Chancellor that it falls far short of proving the wife's adultery.

. At about the same time the husband learned that a neighbor, a married man, had been attentive to the wife. She claims that the neighbor's infatuation was not reciprocated and was so far resented that she told the neighbor's wife. The neighbor's wife, however, testified that her own husband had told her, and she had brought her complaints to the appellant. The Chancellor found nothing in this testimony beyond a suspicion of serious misconduct on the appellant's part, but the husband seems not to have been satisfied with the wife's explanation. At all events, the following month, on December 17, 1951, and after disclosure, the parties resumed marital relations. The wife claims that the husband specifically forgave her. The husband's testimony about specific forgiveness is not clear but cohabitation is not disputed. See *Toulson v. Toulson*, 93 Md. 754, 50 A. 401. The very next day, December 18, he renewed his demand that the wife join him in Philadelphia, and upon her refusal he seems to have revived his old grievances. The record discloses nothing in re-

lation to this proposal to distinguish it from the earlier one which the Chancellor, and we also, regard as lacking genuine basis. The husband did not then or later offer to reestablish his wife in the jointly owned Silver Spring home in which he had installed his father's family.

Upon his discharge from the Navy the compulsory allotment for the wife ended and he made no provision for the support of his dependents. There were some negotiations between their respective lawyers to provide for the child, but these proved fruitless. The appellee made a feeble and unconvincing gesture of reconciliation, expressed in general terms, but unsupported by any offer to restore the wife and child to Silver Spring or in any other definite house. Under the circumstances we must regard him as the deserter. We hold that the wife is entitled to a decree of divorce *a mensa* and such alimony, if any, as the Court on inquiry may find reasonable. The award of alimony *pendente lite* made in her favor seems not unreasonable and is affirmed.

> *Order as to temporary alimony affirmed; decree dismissing bill of complaint reversed, and case remanded for passage of appropriate decree. Appellee to pay costs.*