HULL *v.* HULL
(Appeal and Cross-appeal)

[No. 13, October Term, 1952.]

*Decided January 7, 1953.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Michael Paul Smith* and *W. Albert Menchine,* for Margaret V. Hull, appellant and cross-appellee.

*Herbert Meyerberg,* with whom were *Robert L. Mainen, Smalkin* and *Hessian,* and *H. Richard Smalkin,* for William W. Hull, appellee and cross-appellant.

COLLINS, J., delivered the opinion of the Court.

Maragret V. Hull, hereinafter referred to as the appellant, here appeals from a decree denying her permanent alimony. William W. Hull, her husband, hereinafter referred to as the appellee, cross appeals from the decree dismissing his cross bill for divorce; the

awarding of custody of the two infant children to his wife; ordering support for the children; and assessing him with other expenses.

The appellant filed her bill of complaint for permanent alimony on October 27, 1949, charging the appellee with abandoning and deserting her on September 13, 1949. On June 6, 1950, Mr. Hull filed a cross bill for divorce *a vinculo* charging his wife with adultery. The chancellor held that there was no corroboration of either of the charges. He dismissed the husband's cross bill; denied the wife separate maintenance; awarded custody of the two infant children to Mrs. Hull; ordered Mr. Hull to pay the sum of $4,000.00 per year for the support of the children, all unusual medical and dental expenses of the children, all charges for repairs, replacements, maintenance, insurance premiums, real estate taxes and all public charges on the house jointly owned by the parties; awarded the wife counsel fee of $1,000.00; and ordered Mr. Hull to pay the costs of the proceedings. The pertinent testimony follows.

These parties were married in 1935 in Baltimore and at the time of this trial each was 40 years of age. Two children were born as a result of the marriage: Margaret or Peggy, 14 years of age, and James, 12 years of age at the time of trial. Mrs. Hull, as an infant, was taken into the home of a Mr. and Mrs. Davis and raised by them. Another infant, Helen, when 2 years of age and eleven years younger than Mrs. Hull, was also taken and raised by the Davis family. Mrs. Hull and Helen were regarded as foster-sisters, although no adoption proceedings were ever instituted as to either child by Mr. and Mrs. Davis. Mr. Hull has been a Maryland State Pilot since 1927 and in 1950 his income was $15,116.67. Mrs. Hull is unemployed and has no income.

About 1940 the parties to this case built a home in Baltimore next door to the Davis family. In 1943, Mrs. Davis died and a dispute developed between Mrs. Hull and Mr. Davis on one side and Helen and Mr. Hull on

the other side as to some of Mrs. Davis' possessions. On the night of Mrs. Davis' death, Mr. Hull and Helen left the Davis house about 8 P. M. to go to the Hull home at Mrs. Hull's request. When Mrs. Hull arrived there about 6 A. M. the next morning she found Mr. Hull and Helen "asleep together on the studio couch" in the living room. Mr. Hull said he lay on the couch at Helen's request to comfort her for the loss of Mrs. Davis and went to sleep. He said he slept in his trousers and a robe and on top of the covers. On another occasion Mrs. Hull testified that while she and Helen were attending a Lion's Club dinner, Mr. Hull came in and in the presence of everyone, Helen ran over to him and threw her arms around him. Mr. Hull sat down beside Helen and some of the men said to him: "I suppose that is your wife". Mr. Hull did not correct them. Mrs. Hull also testified that in 1944 or 1945 she heard some gossip in the neighborhood about Helen and her husband and she had seen some things that didn't look "very nice between my sister and him". After dinner in the presence of her husband she told Helen of the gossip, that she had seen things in her home which she did not like and that people were blaming her for letting Helen stay in her home. She said she told Helen: "I just can't understand what is going on but I don't like it and I am not going to stand for it". Helen started to cry and Mrs. Hull went upstairs. When she came down Helen was crying on Mr. Hull's shoulder. Mr. Hull then took Helen home. When he returned she was in bed. He took his pajamas out of the drawer, walked out of the bedroom, went downstairs and slept on the couch in the den and has never returned to sleep with her again.

Mr. Hull denied that any conversation had taken place at any time between him, Mrs. Hull, and Helen concerning the gossip in the neighborhood or that his withdrawal from the bedroom followed this non-existent occurrence. He claimed that he left the bedroom in the fall of 1943 about six or seven months after Mrs.

Davis' death. He said that within a few weeks after Mrs. Davis died his wife began to accuse him of improper relations with Helen, which he denied. In November, 1943, while grain was being loaded on a ship, he was covered with grain dust which turned into a "gooey mess" from moisture and atmospheric conditions and this pasty condition occurred down the front of his blue uniform trousers. When he returned home he put the trousers where it was his usual custom to place clothes for the cleaner. Mrs. Hull and the maid were housecleaning upstairs so he went downstairs to sleep in the den. Suddenly Mrs. Hull awakened him, confronted him with the trousers and accused him of "running around" with women. He said he denied the accusation and she jumped on him and beat him on the head with a pillow. He said: "She told me she always loved me and she always respected me but after this incident she didn't love me anymore but hated me and if I was going to continue to carry on the way I was carrying on, never come back to her bedroom again." Mr. Hull said he told her that if she felt that way about it in spite of all his denials, he would stay downstairs. He said: "I made my bed down there from that time until I left there". He said, however, that he never removed any of his belongings from the bedroom until he left the house. Mrs. Hull testified that the incident about the trousers occurred some time after he had left the bedroom. She denied that she went into a tirade. She said her husband's only reply to her accusation was that she was crazy and it was cheaper to have the cleaning done on Broadway. She denied that she ever ordered her husband out of the bedroom and insisted that he left voluntarily the night she accused Helen and him of improper conduct. It is plainly apparent that there is no corroboration on either side as to just why the husband left the marital bedroom. There is no doubt that he removed from that room.

After this removal there is conflicting testimony, without corroboration, about an alleged assault made by

Mr. Hull on Mrs. Hull. After the husband left the bedroom, Mrs. Hull testified that she requested him many times to come back to her room not only for her sake, but because the children were asking questions. He refused to return. She said on one occasion she offered to put twin beds in any bedroom he desired if he would come upstairs. She said the present arrangement was embarrassing to her when the children had guests. On the other hand, Mr. Hull testified that after he moved to the den in 1943 he tried to become reconciled with her but she always refused him. She would accuse him of misconduct with women and would curse him. He denied she ever asked him to return to her bedroom. It is therefore plain that there is no corroboration on either side as to the conduct of either party from the time he left the marital bedroom to the time he finally left the house. However, Mr. Hull admitted: "On numerous occasions Mrs. Hull would say to me it was very embarrassing, the children were asking questions about it, that she would make arrangements upstairs, either put both children in the same room or put twin beds in the children's room. I told her I was perfectly satisfied sleeping where I was, I would rather stay down there."

At the trial of the case, Mrs. Hull said: "I still love him, Your Honor. That is why I asked for this divorce. I need him, my children need him; we have a lovely home; we worked hard for it." She also said she wanted him to return home regardless of what he might have done because she loved him and she and the children needed him. On cross-examination Mr. Hull testified as follows: "Q. Do you still love your wife? A. I do not. Q. Would you consider returning and living with her? A. Never." The chancellor concluded there was no love or affection on the part of either husband or wife, despite Mrs. Hull's expression.

When asked why he left the house in September, 1949, the time he is charged with deserting and abandoning his wife, he replied as follows. Early in 1949 he went

to Doctor Eastland for a physical examination. He had a feeling of extreme pressure around his kidneys. The doctor gave him a complete physical examination. As a result of that examination and after talking to the doctor he tried to take it a little easier during the summer. Conditions at home continued to make him nervous. He did not feel any better, so when the children went back to school in September, he subleased an apartment and left the marital domicile finally on September 13, 1949. Mrs. Hull testified that when he left on September 13th she thought he had gone down the Chesapeake Bay. The next day she received a letter from Mr. Hull's solicitor. He freely admitted that since he left the home in September, 1949, he had had sexual relations with other women. He testified that after he left the home he went there on one occasion in connection with the children. He said Mrs. Hull came down to the car and told him she was a decent woman and did not want him talking about her and she cursed him, spit in his face and walked away. When he later returned to get his belongings she told him to get what he wanted and get out. Mrs. Hull denied that these incidents ever occurred.

As above set forth, the facts relied on by Mr. Hull to justify his leaving the marital bedroom, as he admits he finally did in November, 1943, are not proven. Therefore, according to the record before us, this was done without justification. Nor are the events relied on by him from November, 1943, to September, 1949, proven. He admits that in September, 1949, he rented another apartment, left the home of his wife and children, and has no intention of returning to them. He said he did this because the quarreling of his wife had undermined his health. There is no corroboration of the charge that his wife quarreled with him at that time. According to the record before us, Doctor Eastland did not testify in the case. We must therefore conclude that Mr. Hull abandoned and deserted his wife on September 13, 1949, as charged in her bill of complaint and, from the record

before us, that the desertion was without justification or excuse.

The law is well settled in this State that a decree for permanent alimony may be granted upon grounds sufficient to support a decree for divorce, either *a vinculo matrimonii* or *a mensa et thoro*. *Strzegowski v. Strzegowski,* 175 Md. 53, 58, 199 A. 809, and cases there cited. *Stirn v. Stirn,* 183 Md. 59, 64, 36 A. 2d 695. Recognizing this authority, the appellant has charged the appellee with abandonment and desertion on September 13, 1949. We are of opinion that this charge has been proven and the husband has not proven justification therefor. This is one of the grounds for a divorce *a mensa et thoro* as set out in Article 16, Section 34, 1951 Code. The decree will therefore be reversed to allow the wife separate maintenance.

In the decree the chancellor ordered that the appellee "pay for all repairs and replacements necessary to keep and maintain the property of the parties in good and livable condition, the need for such repairs and replacements to be determined by the Probation Director of Baltimore County; and shall pay all fire and windstorm insurance premiums, real estate taxes, and other public dues and charges that may become due and payable on said property." An equity court in this State, even in granting divorces, has no power, in the absence of a specific statute, to adjust the property rights of the parties. *Roberts v. Roberts,* 160 Md. 513, 154 A. 95; *Dougherty v. Dougherty,* 187 Md. 21, 32, 33, 48 A. 2d 451. There is no divorce here. This is an alimony case. Article 16, Section 38, 1951 Code, therefore has no application. *Blair v. Blair,* 199 Md. 9, 10-11, 85 A. 2d 442, 443; *Brown v. Brown,* 199 Md. 585, 590-591, 87 A. 2d 626, 628. That part of the decree will therefore be reversed.

The chancellor also ordered that the husband pay "unusual medical and dental expenses of the infant children". In *Kriedo v. Kriedo,* 159 Md. 229, 150 A. 720, 722, the wife obtained a divorce *a vinculo matrimonii*

from her husband with the custody of their minor child, Morris, and an order that the father pay seven dollars per week for the support of the child until further order of the court. The wife filed a petition later in the divorce proceedings stating that since the divorce decree she had incurred hospital, medical, surgical and funeral expenses for the child in the amount of $712.10. She asked that the husband be required to reimburse her for such of these expenses as she had paid and also be required to pay the doctor for unpaid bills so incurred. In sustaining a demurrer to that petition this Court pointed out that the father was under the common law obligation to support the child during its minority and this obligation continued without regard to the divorce decree, unless in that decree the court should order that the child be supported by someone other than the father. This Court further said in that case in holding the obligation to be one at law and not in equity: "Our conclusion, therefore, is that the father is primarily liable for the extraordinary necessary expenses shown to have been incurred for the benefit of his deceased minor child, which liability is to the persons rendering the service in cases where those rendering services have not been paid, and that the mother is entitled to reimbursement from the father in those cases in which payment has been made by her, but that upon the refusal of the father to pay, the remedy is by a suit at law wherein he is entitled to have a jury pass upon questions of fact, including the inquiry as to whether the services were rendered, whether they were necessary, and whether the charge was a reasonable and proper one." We are therefore of opinion that the provision for "unusual medical and dental expenses of the children" should be eliminated from the decree.

The chancellor further ordered that Mr. Hull pay $4,000.00 per annum, payable in equal monthly installments, for the support of the minor children. In his opinion in the case, the chancellor said: "* * * in supporting his children the husband will have to support

the wife because she is necessary for their supervision and care. As long as they need the mother the father has to take care of the wife. We cannot separate the children from the mother in passing upon the question of support." From the salary earned by the husband and the station in life of the parties, we believe that the total sum of $5,000.00 for the support of the wife and children is proper. However, it would be well to specify just how much of this amount is allowed as alimony for the wife. As this award was based on the assumption by the chancellor that the wife and children would live rent free in the jointly owned house, it may in the future be advisable for the chancellor to add to the amount of $5,000.00 per annum any expense incurred by the wife and children for suitable living quarters if these are not provided without expense to the wife in the jointly owned house, in view of our modification of the decree as to the expenses of the house to be paid by the husband. Of course, any award will be subject to further order of the chancellor. The amount of the counsel fee is not contested here.

The appeal from the decree, dismissing the husband's cross bill for a divorce on the grounds of adultery of his wife, is abandoned here. In fact, the testimony on this phase of the case is not included in the printed appendix and is not before us in this case. Rule 39, Sec. 1 (e) of the Rules of the Court of Appeals; *Sunshine Laundry Co. v. White,* 197 Md. 582, 584-586, 80 A. 2d 1, 2, 3. Moreover, the fact that the husband had sexual relations with other women after he left the home in September, 1949, absolutely barred him from a divorce on the grounds of adultery or any other matrimonial offense committed by his wife. *Dougherty v. Dougherty, supra,* 187 Md. 21, 31, 48 A. 2d 451.

> *Decree reversed in part and affirmed in part and cause remanded for the passage of a decree to conform with this opinion. Costs to be paid by William W. Hull.*