956 A.2d 255

**Robert J. WALTER**

v.

**Susan L. WALTER.**

**No. 2339 Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 5, 2008.

Dean E. Richardson (Michael L. Rowan, Ethridge, Quinn, McAuliffe, Rowan & Hartinger on the brief), Frederick, for appellant.

Laura N. Venezia (Conklyn & Associations on the brief), Frederick, for appellee.

DEBORAH S. EYLER, BARBERA * and ROBERT L. KARWACKI, (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

Robert J. Walter ("Robert") challenges a ruling by the Circuit Court for Frederick County granting indefinite alimony, incident to a limited divorce, to Susan L. Walter ("Susan"), his wife, and awarding Susan attorneys' fees. He poses four questions [1] for review, which we have consolidated and rephrased as follows:

---

* Mary Ellen Barbera, now an Associate Judge of the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a member of this Court.

1. The questions presented, as phrased by Robert, are:
   "1. Did the Trial Court err as a matter of law by failing to properly apply the standards set forth in the Family Law Article for awarding alimony?
   2. Did the Trial Court err as a matter of law by failing to properly apply the standards set forth in the Family Law Article for awarding indefinite alimony?
   3. Was it error for the Court to award indefinite alimony when the Trial Court did not determine the amount of a monetary award and

I. Did the trial court err or abuse its discretion by granting indefinite alimony to Susan in a proceeding for limited divorce?

II. Did the trial court err or abuse its discretion by awarding attorneys' fees to Susan?

For the following reasons, we shall vacate the judgment of the circuit court on indefinite alimony and remand the case to that court for further proceedings not inconsistent with this opinion; and we shall vacate the attorneys' fee award.

## FACTS AND PROCEEDINGS

Robert and Susan were married on November 24, 1979. Their marriage produced two children: Alison, born in 1982, and Sophia, born in 1987.

Before marrying, the parties each had attended college and earned a bachelor of science degree in marketing. For the first eight years of their marriage, the parties moved from state to state, depending upon the job market. Robert had a number of jobs that he lost. Although Susan was working as well, Robert was earning more money than she was, so the couple's moves usually were determined by Robert's job opportunities. Robert's jobs first were in teaching and then were in chemical sales.

In 1987, Robert's job brought the family to Frederick, Maryland, where they settled and stayed. During some periods when the children were young, Susan remained at home; for the most part, however, she worked outside the home in marketing and furniture sales. She also worked in the insurance industry for a time.

In 1994, Robert formed his own company, AntiEntropics, Inc. Since the company's inception, it has been run from the

---

failed to consider fully the financial needs and financial resources of both parties?

4. Did the Trial Court err as a matter of law by failing to apply the standards set forth in the Family Law Article for awarding attorney's fees?"

family home. Robert spends most of his work time out of the house at clients' work sites.[2]

During the marriage, the parties lived a comfortable lifestyle. They purchased a house in a nice suburban neighborhood. They accumulated some stocks. Each has an IRA, although the record is scanty on that point. The parties do not have any savings.

It was undisputed that, in 1996, Susan accused Robert of abusing the children (then ages 14 and 9), and made a report to that effect to the local child welfare authorities. The authorities conducted an investigation and determined that there had been no abuse. The abuse allegation against Robert was closed as "ruled out." Susan acknowledged in her testimony that, from then on, there was a rift between the parties "that's really never been cured."

In 2005, Robert admitted to Susan that he had had a number of extramarital affairs, beginning in 2001. He claimed to have started to engage in that behavior after Susan told him repeatedly that she did not want to stay married to him. Susan acknowledged in her testimony that the parties had discussed getting divorced on a number of occasions before they separated.

On June 18, 2005, the parties separated, by agreement. Susan moved to Logodi, Indiana, where she has extended family. She started working as a sales associate at Englert's, a furniture store. She moved into a two-bedroom house, with a yard. Robert remained in the family home. By then, Alison was 23 and no longer living at home. Sophia was 18. She chose to continue living in the family home with Robert. She moved out of the family home in September 2006.

On June 20, 2005, two days after moving, Susan filed a complaint for limited divorce on the ground of voluntary separation. She requested alimony *pendente lite*, indefinite

---

2. There is no information in the record about the nature of AntiEntropics's business. It appears to have some connection to the chemicals business.

alimony, and attorneys' fees. Robert filed a timely answer. The case proceeded through discovery.

Since the separation, Robert has paid the mortgage, taxes, and insurance on the family home and all of the expenses related to the home's upkeep. That total cost is $2,534.97 per month. From June 2005 through March 2006, Robert sent Susan $500 per month. The parties sought to achieve an amicable divorce, by negotiation through counsel.

In March 2006, the parties reached an impasse in their efforts to achieve a settlement. Robert stopped sending money to Susan at that time.

On November 9, 2006, the case went to a merits hearing on the issues of limited divorce, alimony, and attorneys' fees. Both parties testified. Only one witness was called to corroborate the parties' voluntary separation. The parties each introduced into evidence a Rule 9–203(a) financial statement.

In addition, Susan moved into evidence checking account statements for AntiEntropics, from January 1, 2005, through September 30, 2006; a typed list of deposits made into that account during the same time period; checking account statements for Robert from June 22, 2005, through September 20, 2006; a typed list of the deposits made into that account during that same time period; Susan's pay stub from Englert's for the week ending October 29, 2006; joint checking account statements for Robert and Susan from December 9, 2004, through January 10, 2006; and a typed list of the deposits made into that account during that same time period.

After the evidence was closed and the lawyers had presented argument, the trial judge ruled from the bench. She granted Susan a limited divorce, on the ground of voluntary separation; awarded Susan indefinite alimony of $1,500 per month, retroactive to April 6, 2006; established an alimony arrearage of $10,500, entered as a judgment against Robert; and awarded Susan $6,425.92 in attorneys' fees. On December 2, 2006, the court entered a judgment memorializing its ruling. Robert noted a timely appeal.

We shall include additional facts as relevant to our discussion of the issues.

## DISCUSSION

### I.

### *Alimony*

Robert challenges the trial court's award of indefinite alimony to Susan on three bases: a) the court "erred as a matter of law" and made clearly erroneous factual findings when considering his financial resources and needs; b) the court erred and abused its discretion by awarding indefinite alimony incident to a limited divorce; and c) the court's "unconscionable disparity" finding was clearly erroneous. Because we agree with Robert's first argument, that the court made certain clearly erroneous factual findings, we shall vacate the alimony award and remand the matter for further proceedings. We shall address Robert's second argument for guidance on remand. The nature of the error we have found is such that we need not address the third basis for Robert's argument.

### (a)

### *Assertions of Clear Error*

Pursuant to Md.Code (1957, 2006 Repl.Vol., 2007 Supp.), section 11–106(b) of the Family Law Article ("FL"), in deciding whether to make an award of alimony and, if so, in what amount, a circuit court must consider "all factors necessary for a fair and equitable award," including:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and non-monetary, of each party to the wellbeing of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties; [and]

(11) the financial needs and resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under §§ 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits . . . .

*Id.*[3]

■ Ever since the adoption of the Maryland Alimony Act in 1980, alimony may be awarded either for a fixed term (often called rehabilitative alimony) or for an indefinite term. When alimony is awarded, the law prefers that the award be for a fixed term. *See Tracey v. Tracey*, 328 Md. 380, 391, 614 A.2d 590 (1992); *Whittington v. Whittington*, 172 Md.App. 317, 336, 914 A.2d 212 (2007). The court has discretion, however, to award indefinite alimony in exceptional cases when one of the

---

**3.** There is one additional factor, which rarely applies and does not apply in this case:

(12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19–301 of the Health–General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

two circumstances described in subsection (c) of FL section 11–106 has been shown:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

See Solomon v. Solomon, 383 Md. 176, 195–96, 857 A.2d 1109 (2004); Whittington, supra, 172 Md.App. at 337–38, 914 A.2d 212.

In the case at bar, the court ruled from the bench and made findings with respect to all of the applicable FL section 11–106(b) factors. The particular findings that Robert contests on appeal, and that are pertinent to his argument, relate to factors (9) and (11). Specifically, Robert argues that, on the court's own factual findings, he does not have the financial resources to enable him to take care of his own needs and pay the alimony that was awarded to Susan.

The evidence at trial was undisputed that Robert's income from AntiEntropics is and was highly variable and not always sufficient to meet the family's needs. For example, in 2000, the business did poorly, and in 2001 it did especially poorly, losing over $50,000. The latter year was so bad financially that the family had to "cut back" on a number of personal and household expenses and depend upon Susan's income, which at that time was $33,000 annually. It also was undisputed that, although AntiEntropics performed well in 2003 and very early 2004, business "dried up" for the rest of 2004. Performance improved in 2005 and 2006. The court found that the stresses of living with financial uncertainty contributed to the problems in the parties' marriage.

Robert testified that at the time of trial he was earning a little more than $30,000 per year from AntiEntropics. The judge rejected that evidence, upon a finding that, in order to be paying the $2,500+ per month in housing costs that he in

fact was paying, Robert had to be *netting* at least $30,798 per year in income;  and that would mean he likely was *grossing* at least $48,000 in yearly income.  The court imputed an additional $26,000 in yearly gross income to Robert, above and beyond the $30,000+ annual gross income figure he had testified to, and found his current annual gross income from AntiEntropics to be $56,000.  That figure translates into a monthly gross income of $4,667.

The court found that Susan's present gross income from her job in furniture sales is $21,400 per year.  On that finding, Susan's monthly gross income is $1,798.[4]

There was no testimony about the amount of income Robert had earned in the years in which AntiEntropics performed well.  Robert was not asked questions about his past income on direct examination, cross-examination, or by the court.  He testified that, in 2004, the company's gross receipts were between $300,000 and $400,000.  There was no evidence presented about the relationship between the company's gross receipts and Robert's earnings.  During her ruling, the trial judge commented that the deposits into AntiEntropics's checking account were $168,122.35, in 2005, and $127,280.94, in the first nine months of 2006.

On the expense side, the court found, as stated above and as was undisputed, that Robert pays slightly more than $2,500 per month for the debt, taxes, and upkeep for the family home, and will continue to do so during the period of limited divorce, however long that shall be.  The court made no mention of any other expenses for Robert, nor did it reference his financial statement, which was in evidence, and which listed all of his monthly expenses.  The court expressly considered Susan's living expenses, which totaled $4,209 per month, as set forth in her financial statement, which also was in evidence.  (Susan testified that some of her expenses were listed based upon what she actually was spending but some

---

4.  Susan receives health insurance benefits through her employment. Robert does not have health insurance.

were listed based upon what she used to spend.) The court eliminated or reduced several of Susan's listed expenses. For example, Susan's financial statement estimated her food consumption at $600 per month. The court reduced that figure to $400 per month (which was the same figure Robert had given monthly for food in his financial statement).

Several of the court's FL section 11–106(b) findings are not challenged on appeal: that the parties had been married 27 years; that Robert is 49 and Susan is 50; that the parties are in good mental and physical health; that there was no agreement between the parties; that Susan's present annual income of $21,400 makes her "partly self-supporting"; and that Robert made significant monetary and non-monetary contributions to the marriage and Susan made significant non-monetary contributions to the marriage.

The court also found that Robert's financial resources are such that he can afford to pay alimony of $1,500 per month (the amount requested by Susan's counsel) while meeting his own needs. Robert maintains that that finding was clearly erroneous.

Apparently as part of its decision about the period of time in which to award alimony, if at all, the court made findings about the parties' earnings *potentials*. Based upon Susan's past earnings history, the court found that she has the potential to earn $40,000 per year, and that, with that income, she will be "largely self-supporting." The court found that Robert has the potential to earn between $100,000 and $120,000 per year from AntiEntropics. Robert also challenges the latter finding for clear error.

### 1. Robert's ability to pay $1,500 in alimony per month to meet Susan's needs while meeting his own needs.

█ We agree with Robert that the court's own calculation of his current yearly income did not support a reasonable finding that he is able to pay $1,500 per month in alimony to Susan and at the same time meet his own needs. As explained above, the court found, by imputation, that Robert was

earning $ 56,000 annually, which is a gross monthly income of $4,667, and that Susan's current yearly income was $21,400, which is a gross monthly income of $1,798.

It further found that Robert pays $2,500+ per month to maintain the family home, which is the parties' primary marital asset. Of Robert's remaining approximately $2,167 in gross monthly income, the court ordered him to pay $1,500 per month in alimony to Susan. Robert's remaining gross monthly income was $667.

There was some evidence about the sources, other than AntiEntropics, of Robert's deposits into his checking account, but none that would support a finding that he was regularly receiving income greater than the $56,000 determined by the court. Those income sources were money withdrawn from an IRA, a $3,000 home equity loan, and a gift of $10,000 from Robert's father.

For purposes of this issue we shall assume that the trial court's finding imputing a total yearly income for Robert of $56,000 was factually correct. As Susan points out, the court also found that some of Robert's monthly expenses are paid for by his company, as they are in whole or in part business expenses.[5] Even excluding those expenses (such as the cost of gas, telephone, automobile, and other business-related expenses), however, on the court's factual findings on income, Robert must meet all of his remaining ordinary living expenses—such as food, clothing, prescriptions—with $667 per month. And, again, that sum is a gross income amount that does not account for taxes.

Viewed otherwise, the alimony award as fashioned by the court produced a $38,004 yearly gross income for Robert and a $39,576 yearly gross income for Susan. At the same time, the court directed that Robert continue to bear full responsibility for paying $30,000+ per year to maintain the marital home. These figures make plain that the court's finding that Robert can pay $1,500 in alimony to Susan per month and still meet

---

5. In his financial statement, Robert noted which of his listed expenses are paid in whole or in part by AntiEntropics.

his needs is clearly erroneous. The competent and material evidence in the record does not support such a finding.[6]

## 2. Robert's potential future annual income of $100,000 to $120,000.

■ Robert also complains that the court clearly erred in finding as a matter of fact that he has the potential to earn

---

6. Robert also complains that the court committed clear error in its findings about the standard of living the parties established during the marriage and about the reasons for the estrangement of the parties. With respect to the former, the court found from the testimony that "these parties enjoyed a very comfortable and probably what would be colloquially characterized as a[sic] upper-middle class standard of living." Later in her opinion, the court stated, "Until [Susan] left the home in June of 2005, ... [the couple] did enjoy a very nice and comfortable standard of living, that they together established during the marriage." Robert takes issue with the finding that the parties' standard of living was "upper-middle class." From our review of the record, we cannot say that the court's findings about the parties' standard of living were clearly erroneous.

With respect to the reasons for the estrangement of the parties, the court's findings were somewhat abstruse. The court found that financial stress contributed in part to the break-up of the marriage and further found that

the circumstances that led to other relationships, for whatever reason they were chosen, but nevertheless, chosen to occur, but nevertheless, those circumstances that led to their [sic] being other relationships that Mr. Walter had, and I'd heard no testimony whatsoever of Mrs. Walter having any other relationships, I did hear testimony of discussions regarding those relationships, some of the reasons that came about, some of the physical and intimate demands that were placed on Mrs. Walter by Mr. Walter, and that there were other relationships involved, the Court has taken that into consideration, and I have taken that into consideration in reaching my ultimate finding.

Robert's counsel had argued that the other relationships he entered into happened as a consequence of the breakdown in the marriage due to Susan's having reported Robert to the authorities for alleged child abuse. On appeal, Robert complains that the court ignored the fact that Susan had reported him to the authorities for child abuse in assessing the reasons for the break-down of the marriage, even though the evidence was uncontested and Susan acknowledged that the abuse report caused a rift between the parties that never was bridged.

It is not clear to us, from the ruling as quoted above, whether the court was taking that evidence into account in its discussion of Robert's extra-marital relationships. His assignment of error, however, is of no moment given our vacation of the court's ruling and remand for further proceedings.

$100,000 to $120,000 annually. That finding was made in the course of the court's ruling that the alimony award would be indefinite. We agree with this assertion of clear error as well.

The court's reasoning respecting Robert's potential income was as follows. As noted, the bank deposits for AntiEntropics were $168,122.35 for 2005 and $127,280.94 for the first nine months of 2006. The court extrapolated the 2006 deposits from 9 months to 12 months, and then roughly divided the yearly deposits for AntiEntropics by the present income figure it already had ascribed to Robert—$56,000 per year. On that basis, the court found that Robert annually earns in income approximately one-third of the amount of the money deposited to AntiEntropics in a given year. The court then applied that one-third percentage to the gross receipts Robert had testified about for 2004 (between $300,000 and $400,000), and arrived at an annual potential income figure for him of $100,000 to $120,000.

These findings, including the ultimate potential income finding, are flawed in several respects. First, there was no competent material evidence in the record to support the court's threshold finding that, because Robert was paying expenses of $2,500+ per year, he could not be earning the $30,000 yearly he had testified to and he had to have been earning at least $48,000 yearly. The evidence established, as we have mentioned, that, during the pertinent time frame, Robert had certain non-recurring sources of income not connected to his earnings from AntiEntropics: a gift from his father; a withdrawal from his IRA; and the proceeds of a home equity loan. Any or all of those sources of income could account for Robert's ability to pay the monthly $2,500+ expenses associated with the family home notwithstanding his stated income. The finding the court relied upon to impute income to Robert beyond the $30,000 yearly income he was claiming was not supported by record evidence.

Second, given the absence of factual support for that threshold finding about present income, the evidence could not rationally support the court's further finding that Robert's

yearly earnings equal about one-third of the sum that AntiEntropics receives annually in deposits. And, third, a projected income finding, as required for purposes of determining whether an alimony award shall be made indefinite, *see Roginsky v. Blake–Roginsky,* 129 Md.App. 132, 146, 740 A.2d 125 (1999) (cited with approval in *Solomon, supra,* 383 Md. at 195 n. 15, 857 A.2d 1109), *cert. denied,* 358 Md. 164, 747 A.2d 645 (2000)), is not necessarily equal to a party's prior highest past earnings. The court was required to determine, based on the evidence and not on speculation, what Robert had earned in the past and was earning presently, and to project forward, using all of the past and present evidence, not by using only one part of it.

■ As we shall discuss in the next section of this opinion, we are remanding this case to the circuit court for further proceedings. At that time, the parties may introduce additional evidence on the issue of both of their earnings, past and present, including evidence that is up-to-date. If, from that evidence, the court can make findings about current and projected income for the parties that is not speculation or guesswork, then it may exercise its discretion to make an alimony award. It is incumbent that the party seeking alimony, whether rehabilitative or indefinite, move forward with evidence to allow the court to make the factual findings necessary to an alimony determination. *Francz v. Francz,* 157 Md.App. 676, 692, 853 A.2d 839 (2004); *Turner v. Turner,* 147 Md.App. 350, 389, 809 A.2d 18 (2002). The state of the record in this appeal is not such as to support the trial court's factual findings about current and projected or potential income for Robert. For this reason, and the reason discussed above in subsection 1, we shall vacate the court's indefinite alimony award.

### (b)

### *Indefinite Alimony Incident to the Grant of a Limited Divorce*

■ Robert argues that the trial court erred in granting indefinite alimony incident to a limited divorce. As we shall

explain, we conclude that a circuit court is authorized to grant indefinite alimony incident to a limited divorce. We reject, however, Susan's argument that not only may indefinite alimony be awarded incident to a limited divorce but also an award of indefinite alimony incident to a limited divorce continues, automatically, beyond the time of a later-granted absolute divorce, unless the recipient spouse makes a showing of hardship, as required to modify an alimony award. We hold instead that, when indefinite alimony is granted incident to a limited divorce, and the parties then obtain an absolute divorce, all issues of alimony, including the length of any award, must be decided *de novo.*

In Maryland, divorce is and always has been a creature of statute. Until 1841, only the General Assembly had the power to grant a divorce. That year, the legislature enacted the first law conferring authority upon the courts (specifically, equity courts) to grant divorces, both absolute and limited. 1841 Md. Laws, Chap. 263.[7]

An absolute divorce (*a vinculo matrimonii* ) terminates the marriage, severing all legal ties between the parties that are a function of marriage and entitling "either of the parties, or both to remarry." *Ricketts v. Ricketts,* 393 Md. 479, 487, 903 A.2d 857 (2006). By contrast, a limited divorce (*a mensa et thoro* ) does not end the marriage. It is a divorce only "from bed and board," that is, a legal acknowledgment that the parties, although married, are living apart. *Id. See* JOHN F. FADER, II & RICHARD J. GILBERT, MARYLAND FAMILY LAW, § 4–2 at 4–3 (4th ed.2006).

As divorce of any kind exists in Maryland only by statute, a court is limited in granting a divorce to those

---

7. In England, divorce was not recognized in the common law, but the ecclesiastical courts were empowered to grant limited divorces and support attendant to a limited divorce. While many American states adopted that practice, Maryland did not. In 1867, the General Assembly's power to grant divorces was abolished entirely by the enactment of Section 33 of Article 3 of the Maryland Constitution. *Courson v. Courson,* 213 Md. 183, 185–86, 129 A.2d 917 (1957).

grounds enumerated in the law. *Thomas v. Thomas*, 294 Md. 605, 610, 451 A.2d 1215 (1982). For almost a century after Maryland equity courts became empowered to grant divorces, all grounds for divorce, whether absolute or limited, were fault-based.

In 1937, with respect to absolute divorce, the legislature first enacted a ground that was not fault-based: voluntary separation for five years, without cohabitation and with no reasonable hope of reconciliation. 1937 Md. Laws, Chap. 396. In 1961, the legislature reduced the voluntary separation period to 18 months, 1961 Md. Laws, Chap. 104, and, in 1969, it adopted as a new ground for absolute divorce what became known as "involuntary separation" (*i.e.*, separation not by consent) for five years, also without cohabitation and with no reasonable hope of reconciliation. 1969 Md. Laws, Chap. 656. In 1973, the time period for obtaining an absolute divorce by voluntary separation was reduced to one year and by involuntary separation to three years. 1973 Md. Laws, Chap. 699.[8] Ultimately, the involuntary separation period was reduced to two years. 1984 Md. Laws, Chap. 296, § 2; ch. 371.

With respect to limited divorce, until 1973, all grounds were fault-based. That year, the legislature added voluntary separation, without cohabitation and with no reasonable hope of reconciliation, as a ground for a limited divorce. It did not impose a minimum separation period for that ground. 1973 Md. Laws, Chap. 95.[9]

Unlike the power to grant a divorce, which was not judicially authorized until 1841, Maryland equity courts always have had the power to grant alimony. *See Galwith v. Galwith*, 4 H.

---

8. The statutory grounds for an absolute divorce, as of now, are adultery, desertion, voluntary separation for 12 months, conviction of a felony or misdemeanor with a sentence of at least 3 years and service of 12 months of the sentence, two-year separation, incurable insanity or insanity with confinement in a facility for at least 3 years, cruelty of treatment, and excessively vicious conduct. FL § 7-103(a).

9. Presently, the grounds for a limited divorce as set forth by statute are cruelty of treatment, excessively vicious conduct, desertion, or voluntary separation. FL § 7-102(a).

& McH. 477, 478 (1689) (holding by Provincial Court of Maryland that alimony was recoverable either in "Chancery or in a Court of the Ordinary"). Maryland's first alimony statute, adopted by the Acts of 1777, Chap. 22, merely confirmed the previously existing inherent authority of equity courts over alimony. *Thomas, supra,* 294 Md. at 614, 451 A.2d 1215. So, after judicial divorces were authorized in 1841, a wife continued to be able to obtain an award of alimony,[10] even though no divorce was being sought. The Court of Appeals subsequently held, under the alimony statute, that, to obtain alimony, a spouse must be able to show facts that would entitle him or her to an absolute or limited divorce, even if a divorce were not being sought. *Bender v. Bender,* 282 Md. 525, 529–30, 386 A.2d 772 (1978).

In 1980, upon the recommendation of the Governor's Commission on Domestic Relations Law, legislation was enacted that revamped the law of alimony in Maryland. It changed the focus of alimony away from providing a "lifetime pension" and instead toward "eas[ing] the transition ... from the joint married state to [the parties'] new status as single people living apart and independently." *Tracey, supra,* 328 Md. at 391, 614 A.2d 590. *See also Whittington, supra,* 172 Md.App. at 336, 914 A.2d 212.

Under the new Alimony Act, the circuit courts were granted statutory authority to award alimony either on a complaint for alimony or as part of a decree granting an annulment, a limited divorce, or an absolute divorce. FL § 11–101(a). Before granting any form of alimony, however, the court would have to consider the non-exclusive list of factors enumerated in FL section 1 1–106(b). *Simonds v. Simonds,* 165 Md.App. 591, 604–05, 886 A.2d 158 (2005).

---

**10.** Until 1978, only a wife, and not a husband, could obtain alimony in this state. *Hofmann v. Hofmann,* 50 Md.App. 240, 244, 437 A.2d 247 (1981) (adoption of Article 46 of the Maryland Declaration of Rights on November 7, 1978, allowed both the husband and wife to seek and obtain alimony payments).

The year after passage of the Alimony Act, the legislature revamped the law of marital property, also upon the recommendation of the Governor's Commission on Domestic Relations Law. Before the new Marital Property Act was enacted, the property of the spouses was distributed by title upon divorce. Also, prior to the change in the law, the court, in granting a limited divorce, had "full power to award to the wife such property or estate as she had when married, or the value of the same, or of such part . . . as the court may deem reasonable." 1841 Md. Laws, Chap. 262, § 3.

By enacting the new Marital Property Act, the legislature recognized in Maryland the concept of "marital property" and provided for equitable distribution of marital property upon divorce. It also changed the law with respect to distribution of property at the time of a limited divorce. Pursuant to the new law, the court may distribute marital property only in connection with an annulment or absolute divorce, and not in connection with a limited divorce. *See* FL § 8–203(a)(1).

Due to the timing of the various statutory changes in the law of divorce, alimony, and property distribution, there was a period, from 1973 to 1979, when a spouse could immediately obtain a limited divorce on the ground of voluntary separation and at the same time be granted permanent alimony and a distribution of property. After the Alimony and Marital Property Acts were passed, however, the court no longer had the authority to make a distribution of property upon the grant of a limited divorce. It retained authority to award alimony upon the grant of a limited divorce but its decision had to be made in accordance with the factors set forth in FL section 11–106(b) (formerly Md.Code (1957, 1981 Repl.Vol.) Article 16, § 1), and the new focus upon encouraging rehabilitation instead of providing a lifetime pension. *See* FL § 11–101(a)(2)(ii) (alimony may be awarded pursuant to a limited divorce); *Whittington, supra,* 172 Md.App. at 336, 914 A.2d 212 (alimony determination must consider law's preference for rehabilitation).

Since 1980, there has been a dearth of published opinions in Maryland in which alimony was sought or granted incident to a limited divorce.[11] The likely reason is that, under the newly revised Alimony and Marital Property Acts, not only were the courts no longer authorized to make property distributions upon the grant of a limited divorce but also the judicial decision-making about whether to award alimony, and if so, what form of alimony, became intertwined with the judicial decision-making about equitable distribution of marital property. The statutory factors for each such award include consideration of whether the other award has or is being granted. Indeed, it is for that very reason that the cases are legion holding that, when a Maryland appellate court vacates an alimony award and remands the matter for further proceedings, it also should vacate any marital property award, and vice versa, as the two are inextricably linked. *See, e.g., Caccamise v. Caccamise*, 130 Md.App. 505, 524, 747 A.2d 221, *cert. denied*, 359 Md. 29, 753 A.2d 2 (2000); *Campolattaro v. Campolattaro*, 66 Md.App. 68, 75, 502 A.2d 1068 (1986); *Cotter*

---

**11.** In *Ricketts v. Ricketts, supra,* 393 Md. at 484–85, 903 A.2d 857, a husband sought a limited divorce and custody of the spouses' children, even though the parties still were living under the same roof. There was no alimony request in that case.

In *Reuter v. Reuter,* 102 Md.App. 212, 649 A.2d 24 (1994), a court awarded child support and alimony to a wife when it granted a limited divorce. The husband appealed, arguing that the court had committed clear error in determining his potential income, upon a voluntary impoverishment finding, to use in calculating child support. We agreed with the assertion of clear error and vacated the child support award. The husband also challenged the alimony award. We held that the grant of alimony had not been an abuse of discretion but that the trial court had failed to make certain essential factual findings and had committed clear error in determining the wife's income. We remanded the matter "for a determination of Mrs. Reuter's actual income, and a reconsideration of the petition for alimony in light of those findings." 102 Md.App. at 233, 649 A.2d 24. We emphasized that the alimony award only was appropriate because the parties' pre-school child had special needs that impinged upon the wife's ability to work. We suggested that any new award of alimony be limited in time to a period before the child would start attending school full time. We were not asked to address, and did not address, whether an award of indefinite alimony is legally incompatible with the grant of a limited divorce.

*v. Cotter,* 58 Md.App. 529, 542, 473 A.2d 970, *cert. denied,* 300 Md. 794, 481 A.2d 239 (1984).

In the case at bar, Robert maintains that the circuit court lacks authority to award indefinite alimony incident to a limited divorce because the two are conceptually incompatible. As we have explained above, however, the judicial authority to grant indefinite alimony incident to a limited divorce is expressly conferred, in general terms, by FL section 11–101(a). Moreover, the particular statute authorizing the grant of a limited divorce states that such a divorce may be "for a limited time or for an indefinite time," FL § 7–102(c). (Unlike an absolute divorce, a limited divorce may be revoked upon the joint application of the parties. FL § 7–102(d).) A limited divorce and an award of indefinite alimony attendant to it are not incompatible concepts. In the family law context, "indefinite" does not mean "permanent." Rather, it means only that the award is not "fixed term" or rehabilitative, that is, for a defined ("definite") period of time. *See Long v. Long,* 129 Md.App. 554, 585–86, 743 A.2d 281 (2000) (indefinite alimony is not "etched in stone. At best, it is written in chalk on slate, subject to being erased by the appropriate court order." (Quoting *Hofmann, supra,* 50 Md. App. at 245, 437 A.2d 247.) Thus, an award of alimony during a limited divorce can be indefinite, in that it is not for a fixed period that is a subset of the entire period of the limited divorce.

Although the circuit court indeed is authorized to award indefinite alimony incident to a limited divorce, we see no merit in the argument Susan advances, which is that, once indefinite alimony is awarded in that context, it necessarily continues beyond the point at which an absolute divorce is granted unless the paying party can prove that he or she is entitled to modification, under FL section 11–107, or termination, under FL section 11–108. Because this issue has been addressed by the parties on appeal and surely will resurface on remand, we shall decide it.

As explained, when granting a limited divorce, a circuit court is not empowered to distribute the spouses' marital property. FL § 8–203(a) (division of marital property authorized only upon annulment or absolute divorce). The equitable distribution of property decision, pursuant to FL sections 8–201 *et seq.*, only can be made in tandem with a grant of an annulment or an absolute divorce, and involves findings, such as valuations, that must be fixed to the time of the annulment or absolute divorce. FL § 8–204(a); *see Doser v. Doser*, 106 Md.App. 329, 348, 664 A.2d 453 (1995).[12] FL section 8–205(b) lists the factors a court must consider in deciding how to dispose of marital property, including whether to grant a monetary award to adjust the equities of the parties, to transfer an ownership interest in a pension, retirement, profit sharing, or deferred compensation plan, or, subject to the consent of lienholders, family use personal property and/or real property jointly owned and used as the parties' principal residence during the marriage. Those factors include "(3) the economic circumstances of each party at the time the [monetary] award [if any] is to be made"; "(10) any award of alimony . . .; and (11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award [or transfer of an interest in a pension or retirement account]."

Just as the FL section 8–205(b) factors make express reference to any companion decision about alimony, the factors that must be considered in deciding whether to grant an alimony award, listed in FL 11–106(b), likewise include "(11) the financial needs and financial resources of each party, including . . . (ii) any award made under § [ ] 8–205 . . . of this article[,]" which is a monetary award that only can be made in conjunction with the grant of an annulment or absolute divorce. As we already have said, it is because the equitable distribution/monetary award decision and the alimony decision

---

12. An award of use and possession of the family home and family use personal property may be made incident to an annulment, a limited divorce, or an absolute divorce. FL § 8–208(a).

are interdependent that the vacation of one on appeal ordinarily will require the vacation of the other. *See Campolattaro, supra,* 66 Md.App. at 75, 502 A.2d 1068.

Whether a paying party is seeking to modify an award of alimony, under FL section 8–107, or to terminate it, under FL section 11–108, that party bears the burden of proof on the modification or termination question. *See Langston v. Langston,* 366 Md. 490, 516, 784 A.2d 1086 (2001), *abrogated on other grounds by Bienkowski v. Brooks,* 386 Md. 516, 539, 873 A.2d 1122 (2005); *Ridgeway v. Ridgeway,* 171 Md.App. 373, 384, 910 A.2d 503 (2006), *cert. denied,* 396 Md. 526, 914 A.2d 769 (2007). In other words, the alimony award will continue in the amount and for the time awarded (including indefinitely) unless the paying party moves successfully for modification or termination. *See Long, supra,* 129 Md.App. at 585–86, 743 A.2d 281. Given that that is the case, it would defy logic, and the harmonious interpretation of the Family Law Article statutes we just have discussed, for an award of indefinite alimony, in conjunction with a limited divorce, to continue in effect after the court has granted the same parties an absolute divorce.

The caselaw is clear that a party seeking an alimony award upon the grant of an absolute divorce bears the burden of proof. If an alimony award granted incident to a limited divorce were to continue automatically, beyond the period of the limited divorce, unless the paying party met his or her burden to prove that a modification or termination should be granted, the burden of proof would no longer be on the seeking/payee party. Rather, in conjunction with an absolute divorce, the paying party would bear the burden of proving that alimony should not be granted, or that a lesser amount of alimony should be granted.

Susan's modification/termination argument would undermine the clear legislative intent behind those provisions in FL sections 8–205 and 11–106 that require the circuit court to consider rulings on equitable disposition/monetary award when deciding whether to grant alimony, and vice versa. It is

impossible for a court to consider equitable distribution/monetary award rulings when granting alimony incident to a limited divorce, as the court has no power to decide those property disposition issues at that juncture.

Accordingly, for these reasons we hold that an award of indefinite alimony incident to a limited divorce must terminate when the limited divorce has ended upon the grant of an absolute divorce; and a decision to grant alimony incident to the grant of an absolute divorce, after a period of limited divorce that included an indefinite alimony award, is not to be made by means of a modification or termination standard, but by consideration of the factors set forth in FL section 11–106, with the burden of proof on the party seeking alimony.

## II.

### *Award of Attorneys' Fees*

Because we are vacating the circuit court's indefinite alimony award, made incident to the grant of a limited divorce, and remanding the matter for further proceedings, we also shall vacate the court's attorneys' fee award. *See Freedenburg v. Freedenburg*, 123 Md.App. 729, 742, 720 A.2d 948 (1998) (because an award of attorneys' fees is so "interrelated and intertwined" with an award of property or alimony, vacation of the alimony award ordinarily requires vacation of the attorneys' fee award); *Doser, supra*, 106 Md.App. at 335–36 n. 1, 664 A.2d 453. The circuit court should address the attorneys' fees request anew on remand.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE APPELLEE.**