984 A.2d 295

**Guzman CRUZ**

v.

**Clemencia Solis SILVA.**

**No. 0550, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Nov. 25, 2009.

Mazin I. Elias (Stephen E. Moss, Deckelbaum, Ogens & Raferty, on brief), Bethesda, for Appellant.

Julia H. Cohen, Washington, DC, for Appellee.

Panel: DAVIS, WOODWARD and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

The notion of alimony totally disconnected from a divorce, albeit a practice boasting a venerable pedigree, has become at least quaintly anachronistic, if not actually vestigial, in 21st Century Maryland.  Just such a self-contained grant of alimony, however, is what we are urged to hold survived the shipwreck of a divorce proceeding in the Circuit Court for Prince George's County on January 9, 2008.  Involved is an unusual 300–year–old procedure, the *raison d'etre* for which did not outlive the Mexican War.

### The Dramatis Personae

The appellant, Guzman Cruz (Husband), and the appellee, Clemencia Solis Silva (Wife), were married on December 19, 1995.  Two children were born of that union:  Salvador Cruz, on February 18, 1996;  and Yesenia Cruz, on January 10, 2000.  On January 25, 2007, the Husband filed a Complaint for Limited Divorce on the basis of a one-year voluntary separation.  On July 2, 2007, the Wife filed a Counter–Complaint For Absolute Divorce or, In the Alternative, for Limited Divorce, alleging as her grounds:  1) adultery and 2) abandonment.  The divorce charges were thus double-barreled, with the Husband seeking a limited divorce and the Wife, an absolute one or, in the alternative, a limited one.  The Wife also requested alimony.

## A Legal Shipwreck

The primary language of both parties is Spanish, and they, at trial, utilized an interpreter. Both parties, moreover, appeared *pro se,* although they had earlier been represented by counsel. Proceeding in such a legally untutored fashion, of course, is an invitation to disaster, and in this case the voyage out never cleared the harbor. At the outset of the hearing, the Husband's very first response foreshadowed trouble dead ahead:

COURT: ... Let me ask another question. *Did you bring a witness to corroborate your grounds for divorce?*

A *No.*

Q Well then, you can't, *then your request for divorce is going to be denied* because the Court can't award a divorce without a corroborating witness. According to the law, we need to have any grant of divorce proved and corroborated.

(Emphasis supplied).

To the extent to which the divorce proceeding depended on his making a case, it teetered unsteadily. Within the minute, the Wife delivered the *coup de grace:*

COURT: *Did you bring a witness for a limited divorce?*

A *No.*

Q Okay. So, what's going to happen today, so everybody's clear, is we will go forward on the complaint and on the counter-complaint. *Since nobody brought a corroborating witness the Court will not be able to award anybody a divorce or a limited divorce.*

(Emphasis supplied).

Not only did neither party prove legally sufficient grounds for divorce, but neither even gave testimony which, if corroborated, might have established grounds for divorce. At that point, of course, there was still the possibility that corroborating witnesses might arrive in the nick of time to salvage the divorce proceeding, but no such salvage effort was ever made. The whole issue of divorce, or even the setting out of grounds

for divorce, was off the table. The trial judge, nonetheless, resolved to soldier on.

So, the only issues it seems to me that are before me today are child support and alimony.

When the final curtain rang down on the January 9 performance, moreover, the run was over. There would be neither postponement nor continuance. In announcing the "Findings of the Court," the trial judge began:

THE COURT: Okay. This matter is here, complaint for limited divorce, requesting among other things a limited divorce, custody, use and possession of the home as well as a counter complaint for divorce, alimony, child support, property and use and possession. Both parties have chosen to proceed pro se although both parties were represented by counsel until this morning. And *neither party brought a corroborating witness to proceed on their claim for a divorce or limited divorce.*

*Accordingly, the request for a divorce, limited divorce and the property request will all be denied and dismissed* insofar as any matter of property award and use and possession will be contingent upon a divorce, a limited divorce as the case may be.

(Emphasis supplied).

As the trial ground to a halt, the judge denied the Husband's "Complaint for Limited Divorce and [the Wife's] Counter-complaint for Absolute Divorce." The divorce case, in both directions, had collapsed before it got started.

### What, If Anything, Was Salvaged?

What about survivors? The judge did award the custody of the two minor children to the Wife and ordered the Husband to pay $764.00 per month in child support. The judge also ordered the Husband to pay to the Wife the sum of $1,500.00 per month as indefinite alimony. There was no mention in the Order of the Court that the alimony was merely to be *pendente lite*. Not only has neither party ever suggested that the indefinite alimony in this case was alimony *pendente lite*, but

there was no such possibility. There was no litigation that remained pending. There was no "lite" to be "pendente." The Court Order directed that "this case be and hereby is closed statistically."

The Order of Court followed on January 23, 2008. Pertinent for possible survival purposes are the orders dealing with 1) indefinite alimony and 2) child support.

ORDERED, that *Plaintiff* be and hereby *is directed to pay to Defendant the sum of $1,500.00 per month as indefinite alimony* accounting and accruing from January 1, 2008. Said payments are to be made through the Office of Child Support Enforcement by wage lien; and it is further

ORDERED, that *Plaintiff* be and hereby *is directed to pay to Defendant the sum of $764.00 per month as child support* for the minor children accounting and accruing from January 1, 2008. Said payments are to be made through the Office of Child Support Enforcement by wage lien; and it is further[.]

(Emphasis supplied).

The final two orders left no doubt that both requests for divorce were absolutely denied and that the case was finally closed.

ORDERED, that all other requests in *Plaintiff's Complaint for Limited Divorce and Defendant's Counter-complaint for Absolute Divorce be and hereby are DENIED;* and it is further,

ORDERED, that *this case be and hereby is closed statistically.*

(Emphasis supplied).

The overarching question before us is: With the core issue of divorce excised from the case, what vitality, if any, remains in the extremities of 1) the grant of indefinite alimony and 2) the award of child support?

## The Contentions

The Husband has taken a timely appeal and now contends

1.  that the trial court erred in awarding indefinite alimony to the Wife;

2.  that the trial judge should, on remand, be required to consider the recoupment by the Husband of the alimony erroneously awarded to the Wife; and

3.  that the trial court erred in calculating the child support award.

### Alimony Standing Alone

Contending that the trial court erred by awarding indefinite alimony to the Wife, the Husband mounts a four-pronged attack, asking:

> Whether the trial court erred in making an award of indefinite alimony when it failed: (A.) to grant a divorce and no evidence was offered to prove grounds for divorce or the cause of the estrangement of the parties; (B.) to make the necessary projection of the point in time when Ms. Silva would reach maximum potential income; (C.) to properly determine whether the parties standards of living would be unconscionably disparate; and (D.) to take into account the Appellant's monthly expenses.

We are persuaded by the first prong. Because the Wife never established a proper predicate entitling her to alimony, such an award was a nullity *ab initio*. The latter three issues, dealing only with a determination of the type of alimony and the calculation of the amount of alimony, are self-evidently moot As Judge Deborah Eyler noted in *Whittington v. Whittington,* 172 Md.App. 317, 342, 914 A.2d 212 (2007), "Because we are vacating the alimony award, there is no reason for us to comment upon the amount of the now-vacated award." This case turns on the validity of the first sub-contention.

Although the very notion of alimony without divorce may strike the lay ear as an oxymoron, the concept enjoys a long and venerable history, at least in this State. It is, in a sense, an artifact from another time and it behooves us to examine its etiology.

## Distant Beginnings

██ Although the power of the courts to grant divorce is exclusively a creature of statute, with "no existence in the absence of statutory enactment," *Outlaw v. Outlaw*, 118 Md. 498, 500, 84 A. 383 (1912), the inherent power of the courts to award alimony is almost as old as the Proprietary Colony of Maryland itself. In 1689, the Provincial Court held in *Galwith v. Galwith*, 4 H. & McH. 477, 478 (1689), that the power to grant alimony rested in the Court of Chancery. See also *Crane v. Meginnis*, 1 Gill and Johnson 463, 475 (1829). The legislative imprimatur was placed on that power by one of the first acts of the newly independent State of Maryland, as Chapter 12 of the Acts of 1777 officially bestowed the power over alimony on the Courts of Equity. The Act expressly provided that:

> "*The Courts of Equity* of this State *shall* and may hear and *determine all causes for alimony* in as full and ample manner *as such cases could be heard and determined by the laws of England in the Ecclesiastical Courts there.*"

(Emphasis supplied).

Although the Maryland courts would, after 1777, try to hear and determine alimony cases just as did the Ecclesiastical Courts of England, there was one gaping difference between the two court systems. The English courts invariably resolved the alimony issue along with their granting of limited divorces (divorces *a mensa et thoro* ), the companion issue that would seem to be alimony's inevitable concomitant. Maryland, by dramatic contrast, did not. The Maryland courts had no power to take up what would seem to have been the logically complementary issue of limited divorce for the simple reason that they had no jurisdiction over divorce. This disparity between how England handled the two related issues together and how Maryland either bifurcated them or totally ignored one of them was discussed in *Emerson v. Emerson*, 120 Md. 584, 589, 87 A. 1033 (1913), as the Court of Appeals described the linkage between limited divorce and alimony in the English courts.

> *Limited divorces with alimony were* in England for years
> *granted by the Ecclesiastical Courts. In this State,* there
> being no Ecclesiastical Courts *the Legislature granted di-*
> *vorces;* but the Courts of Chancery assumed jurisdiction
> over alimony. But by the Act of 1777, Ch. 12, the power
> was given expressly to Courts of Equity to exercise this
> jurisdiction.... *The only kind of alimony known to the*
> *Ecclesiastical Courts being that granted in connection with*
> *limited divorces.*

(Emphasis supplied).

### What Was Alimony?

Alimony originally was an aspect of divorce *a mensa et*
*thoro* or legal separation. A husband was legally responsible
for the proper maintenance of his wife. If he failed to fulfill
that obligation, the Ecclesiastical Courts in England and the
Equity Courts in Maryland stepped in and ordered him to do
so. What came to be called alimony was simply a fancy name
for separate maintenance. If the husband either 1) failed to
provide for his wife while they were living together or 2),
without justification, forced her to leave the marital abode, the
equity court could order him to provide for her maintenance
by what it called "alimony." *Wallingsford v. Wallingsford,* 6
H. & J. 485, 488 (1825), first defined the meaning of the term:

> *Alimony is a maintenance afforded to the wife,* where the
> husband refuses to give it, or where from his improper
> conduct compels her to separate from him. *It is ... a*
> *provision for her support, to continue* during their joint
> lives, or *so long as they live separate.* Upon the death of
> either, or *upon their mutual consent to live together, it*
> *ceases.*

(Emphasis supplied).

*Outlaw v. Outlaw,* 118 Md. at 502, 84 A. 383, quoted with
approval from Chancellor Bland in *Helms v. Franciscus,* 2
Bland 544, 565 (Md.Chanc.1830):

> "If by the cruel or immoral conduct of the husband the
> wife cannot with safety and in decency consort with him,

then *she may* upon the ground of such ill-treatment come into a Court of Equity and *have a separate maintenance assigned to her* out of her husband's estate."

(Emphasis supplied).

*Emerson v. Emerson,* 120 Md. at 590, 87 A. 1033, used the *Wallingsford* definition in 1913 and confirmed its continuing vitality.

This is *the definition of alimony* which has been recognized and followed through all of the Maryland decisions down to the present. The right *was founded on the common law obligation of the husband to give support to his wife.*

(Emphasis supplied). See also *Altman v. Altman,* 282 Md. 483, 491, 386 A.2d 766 (1978) ("The alimony awarded by the Ecclesiastical Courts in such cases constituted a recognition and enforcement of *the husband's duty to support a wife* which *continued after the judicial separation.*") (Emphasis supplied); *Clayton v. Clayton,* 231 Md. 74, 77, 188 A.2d 550 (1963) ("*We read 'alimony'* not in the technical sense of the word, but *as commensurate with 'support.'*") (Emphasis supplied); *Courson v. Courson,* 213 Md. 183, 186, 129 A.2d 917 (1957); *Foote v. Foote,* 190 Md. 171, 180–81, 57 A.2d 804 (1948); *Staub v. Staub,* 170 Md. 202, 207–08, 183 A. 605 (1936); *Polley v. Polley,* 128 Md. 60, 63, 97 A. 526 (1916); *McCaddin v. McCaddin,* 116 Md. 567, 572, 82 A. 554 (1911); *Keerl v. Keerl,* 34 Md. 21, 25 (1871).

·In the common law world generally, the very idea of alimony grew out of the symbiotic relationship between a divorce *a mensa et thoro* (or legal separation), on the one hand, and the legally mandated provision for the wife's maintenance (alimony) for the duration of that separation, on the other hand. Alimony was just an incident of a divorce *a mensa.* By contrast, there was originally no such thing as alimony in connection with an absolute divorce. Although dramatic revolutionary changes in the law of divorce have buffeted the original concept of alimony, the definition provided by the early caselaw has nonetheless remained essentially in place, as

was noted by *Emerson v. Emerson*, 120 Md. at 589–90, 87 A. 1033:

> *Nowhere in our statutes is there a definition of what alimony is, and our Courts,* since the Act of 1841, in granting alimony in connection with a decree of divorce *a vinculo, have been awarding it as it was understood and awarded by* the Ecclesiastical Courts of England and *our Equity Courts, as incidental to divorce a mensa*. . . .
>
> . . . .
>
> The Act [of 1841] makes no distinction whatever between alimony upon a decree *a mensa* and upon a decree *a vinculo. We think it is clear, then, that the Act* providing for alimony upon this decree, new to the Courts, was *intended to provide for alimony of the same character and limitations as the alimony the Courts had for so long dealt with.*

(Emphasis supplied). And see *Altman v. Altman*, 282 Md. 483, 491–92, 386 A.2d 766 (1978) ("[T]he Legislature had intended to provide for alimony of the same character and limitations as the alimony the courts had for so long dealt with in the context of the divorce *a mensa et thoro*."); *Clayton v. Clayton*, 231 Md. at 77, 188 A.2d 550; *Walker v. Walker*, 125 Md. 649, 659, 94 A. 346 (1915).

### Why Has Alimony, In Maryland, Frequently Walked Alone?

As the present case brings to the fore, we are still called upon in Maryland to deal with this unusual procedural phenomenon—a free-standing request for alimony without an accompanying divorce. This practice is well out of the main stream, however, and should not blithely be taken for granted. It deserves further inquiry, but such inquiry in the caselaw has been notoriously skimpy. With respect to permitting a request for alimony to stand alone, the caselaw is full of description of **WHAT** the practice entails. It is perplexingly silent, however, about **WHY** we still have such a practice or about **HOW** such a perpetuation of the practice came to be.

In the Ecclesiastical Courts of England, which our alimony law was directed to emulate, and in most American states, alimony was, as we have just discussed, inextricably linked to the granting of a limited divorce. A request for alimony in Maryland, however, stood alone. When Chapter 12 of the Acts of 1777 conferred jurisdiction over questions of alimony on the equity courts, it directed them to treat alimony just "as such cases could be heard and determined by the laws of England in the Ecclesiastical Courts there." Ironically, however, the equity courts of Maryland had to turn an immediate blind eye on the most salient feature of the English practice. The English courts dealt with alimony only as an incident of divorce *a mensa et thoro.* The two were neatly packaged in a single verdict. In *Courson v. Courson,* 213 Md. 183, 185, 129 A.2d 917 (1957), the Court of Appeals described this indivisible tie in the English practice between alimony and an *a mensa* divorce.

*The only legal separation recognized was a divorce from bed and board upon a decree of the Ecclesiastical Court. These Courts,* as an incident to the decree, *granted alimony,* temporary or permanent, *but only as a part of the decree a mensa et thoro. Alimony,* therefore, under the English law *had no independent existence,* and *no Court,* not even the Ecclesiastical, *could grant alimony when it was the only relief sought.*

(Emphasis supplied). See also *Clayton v. Clayton,* 231 Md. at 76, 188 A.2d 550; *Staub v. Staub,* 170 Md. 202, 208, 183 A. 605 (1936); *Keerl v. Keerl,* 34 Md. 21, 25 (1871).

In *Thomas v. Thomas,* 294 Md. 605, 609–10, 451 A.2d 1215 (1982), Judge Eldridge noted that in the English practice alimony had no independent life.

In England, during the seventeenth and eighteenth centuries, courts did not grant absolute divorces (divorce *a vinculo matrimonii* ), but the ecclesiastical courts would grant divorces from bed and board (divorce *a mensa et thoro* ). *Incidental to the a mensa divorce, the ecclesiastical courts could award alimony to the wife.* Nevertheless, for most of this period, *alimony had no independent exis-*

*tence* under English law; *it could be awarded only by an ecclesiastical court and only as part of a divorce decree. This English "doctrine was adopted and followed in . . . many of the States in this country, but not in Maryland."* (Emphasis supplied).

The Maryland courts failed to follow the English courts in this regard for the simple reason that they were powerless to do so. The obviously logical English practice of joining the related questions of legal separation (divorce *a mensa* ) and separate maintenance (alimony) in a single proceeding was beyond the authority of the Maryland courts to effect. In our *Thomas v. Thomas,* 48 Md.App. 255, 262, 426 A.2d 976 (1981), Judge Wilner took note of our divergence from the English practice.

[T]he ecclesiastical courts awarded alimony only as part of a decree of divorce *a mensa et thoro; there was no separate action permitted just for alimony.* Yet it appears that from a very early time *the Maryland chancery court presupposed and occasionally exercised the authority to award alimony where no divorce was granted, and indeed where an a mensa divorce was not even sought.*

(Emphasis supplied).

That opinion also noted that the authority for Maryland's remedy was at least suspect, although it may now be late in the day to raise such a question.

*The precise authority for such a practice,* at least in Provincial times, *was questionable,* as it cannot be said to have emanated from the ecclesiastical law or practice. *It appears that the authority was simply assumed* as part of inherent chancery jurisdiction.

*Id.* (emphasis supplied).

In its *Thomas v. Thomas,* 294 Md. at 613, 451 A.2d 1215, the Court of Appeals also described how Maryland had departed from the English practice of linking alimony with divorce.

*[T]he relationship between divorce and alimony under the English law was adopted in some areas of this country but*

*not in Maryland.* Although under Maryland law divorce and alimony are tied together for certain purposes, *alimony has never been viewed as an incident of divorce.* Indeed, the jurisdiction of equity courts to grant alimony, unlike a divorce, was not based upon statute. Instead, *the power to grant alimony was deemed to be within the inherent authority of Maryland equity courts.*

(Emphasis supplied).

The self-evident reason why Maryland before 1841 could not follow the English suit was because the legal authority to grant a divorce resided exclusively in the Maryland General Assembly. *Walter v. Walter,* 181 Md.App. 273, 289, 956 A.2d 255 (2008) ("Until 1841, only the General Assembly had the power to grant a divorce."); *Thomas v. Thomas,* 48 Md.App. at 261–62, 426 A.2d 976 ("Until 1841, the granting of an absolute divorce remained exclusively a legislative prerogative and was effected by Act of the General Assembly."); *Outlaw v. Outlaw,* 118 Md. at 500–01, 84 A. 383 ("For a long time after the separation of this State from England, divorces were obtainable, and obtainable only, through an Act of General Assembly, and it was not until 1841 that this power was conferred upon the Courts.").

The division of powers between the legislative branch of government and the judicial branch tracked precisely the wall of separation between divorce and alimony. The wall was impenetrable from either side. The court, able to award alimony, was powerless to grant a divorce. The Legislature, able to grant a divorce, was constitutionally forbidden to award alimony. See *Thomas v. Thomas,* 294 Md. at 614 n. 15, 451 A.2d 1215:

> *Awarding alimony was deemed to be so clearly an inherent judicial function that a legislative award of alimony* to a specific individual *was* held *unconstitutional* under the separation of powers provision in the Maryland Declaration of Rights. *Crane v. Meginnis,* 1 G. & J. 463, 19 Am. Dec. 237 (1829).

(Emphasis supplied). As it had been since 1689, a request for alimony was a procedural orphan on the wrong side of the wall of separation.

## The Procedural Rapprochement of 1841

In 1841 the wall came tumbling down. Chapter 263 of the Acts of 1841 for the first time authorized equity courts to grant divorces, both limited divorces *a mensa et thoro* and absolute divorces *a vinculo matrimonii*,[1] along with the concomitant authority to award alimony in such cases. Initially, the General Assembly reserved to itself a concurrent authority to grant divorce (but no alimony). *Wright v. Wright*, 2 Md. 429 (1852). That concurrent authority, however, was short-lived. The Constitution of 1851 forbade the General Assembly to grant divorces. That prohibition was repeated in the Constitution of 1867 and is now set out as § 33 of Article III. *Courson v. Courson*, 213 Md. at 186, 129 A.2d 917.

The Divorce Act of 1841 also made some significant changes in what the equity courts could do by way of awarding alimony. Before 1841 alimony was only separate maintenance in connection with what would have been a divorce *a mensa*, if the court had possessed the authority to grant such a divorce. The maintenance was an incident of marriage and could continue only so long as the marriage itself continued. As of 1841, however, the court was for the first time given the authority to award alimony even in a case of divorce *a vinculo matrimonii*, In *Altman v. Altman*, 282 Md. at 491, 386 A.2d 766, Judge Levine explained the significant change that took place.

[E]ven in England early judicial divorces were only *a mensa et thoro*, from bed and board.

*It was not until the enactment of chapter 262 of the Laws of 1841*, when divorce jurisdiction was conferred on the equity courts of this state, *that the divorce a vinculo matrimonii—and the power to award alimony therein—*

---

1. Absolute divorce was not permitted in England until 1857, when it was first authorized by the Divorce Act of 20 & 21 Victoria, ch. 85.

*gained recognition. Prior to 1841, it was only as an incident to the divorce a mensa et thoro that alimony had been awarded,* first by the English Ecclesiastical Courts, and in Maryland by the equity courts after 1777. The alimony awarded by the Ecclesiastical Courts in such cases constituted a recognition and enforcement of the husband's duty to support a wife which continued after the judicial separation.

(Emphasis supplied).

In *Thomas v. Thomas,* 48 Md.App. at 263–64, 426 A.2d 976, this Court also noted that it was the Divorce Act of 1841 that first gave the courts of this State the authority to award alimony in cases of absolute divorce.

By Acts of 1841, ch. 262, the General Assembly first conferred statutory jurisdiction over *divorce* actions on the equity courts. *The Act set forth the grounds cognizable for a vinculo and a mensa divorces, confirmed the preexisting authority of equity over the latter, and, for the first time, expanded that authority to include the former.* Section 3 provided that "in all cases where a divorce is decreed, the court passing the same shall have full power to award alimony to the wife. . . . "

(Emphasis supplied).

In any event, as of 1841 the authority of a single court both to grant a divorce and also to award alimony meant that a request for alimony was no longer a procedural orphan doomed to walk alone. It could now travel in tandem with a divorce case. The procedural orphan, however, had been walking alone for 152 years (since 1689) and, through long entrenched habit, did not look with unbounded enthusiasm on the opportunity to reenter the litigational fold. The question became whether the procedural orphan of an alimony request without seeking a divorce would be permitted to continue to walk alone now that it was no longer required to do so. Why, but for inertia, did an unbalanced, peg-legged procedure that should have expired with William Henry Harrison remain a

part of our practice? Strangely, that question, was never asked.

## Bare Requests For Alimony Post–1841

Why not? What happens to an unusual procedure, born of necessity, when the necessity that gave rise to it ceases to exist? The continuing propriety of a naked alimony request was basically just taken for granted. The bare request for alimony, unadorned by a grant of divorce or even a request for divorce, had over a trajectory of a century and a half developed a fierce independence and simply continued, essentially without challenge, to do what it had been doing for 15 decades. Familiarity can acquire an inertial power of its own.

In post–1841 Maryland, of course, alimony could be sought, as the Act of 1841 provided, as an incident of a divorce, limited or absolute, that was actually granted. It could also continue to be sought, as it had long and habitually been sought, as a bare request for alimony without more. Judge Eldridge made this point in *Thomas v. Thomas*, 294 Md. at 614, 451 A.2d 1215.

[A]fter judicial divorces were authorized, an eligible plaintiff continued to be able to obtain an award of alimony *even though no divorce was sought.*

(Emphasis supplied). Judge Deborah Eyler recently observed for this Court in *Walter v. Walter*, 181 Md.App. 273, 291, 956 A.2d 255 (2008):

[A]fter judicial divorces were authorized in 1841, a wife continued to be able to obtain an award of alimony, *even though no divorce was being sought.*[2]

(Emphasis supplied). See also *Blumenthal v. Blumenthal*, 258 Md. 534, 539, 266 A.2d 337 (1970) ("Courts of equity have

---

**2.** That opinion also pointed out that until 1972, "only a wife, and not a husband, could obtain alimony in this state," but that the adoption of Article 46 of the Maryland Declaration of Rights on November 7, 1972, outlawing gender discrimination, now "allowed both the husband and wife to seek and obtain alimony payments." See *Hofmann v. Hofmann,* 50 Md.App. 240, 244, 437 A.2d 247 (1981).

inherent power, independent of authority to grant a divorce, to entertain and grant an application by a wife against her husband for alimony where he is at fault."); *Wathen v. Wathen*, 245 Md. 684, 686, 226 A.2d 350 (1967) ("Equity has jurisdiction to decree the payment of separate maintenance to a wife although she does not ask for a decree of divorce."); *Hull v. Hull*, 201 Md. 225, 232, 93 A.2d 536 (1953) ("There is no divorce here. This is an alimony case."); *Foote v. Foote*, 190 Md. 171, 57 A.2d 804 (1948); *Winkel v. Winkel*, 176 Md. 167, 169, 4 A.2d 128 (1939) ("[A] decree for alimony may be passed without the granting of a divorce."); *Hood v. Hood*, 138 Md. 355, 361, 113 A. 895 (1921) ("In this State a wife can sue for alimony, although she does not ask for a divorce."); *Polley v. Polley*, 128 Md. 60, 97 A. 526 (1916); *McCaddin v. McCaddin*, 116 Md. 567, 568, 82 A. 554 (1911) ("There is no question in this State about the power of a Court of Chancery to entertain an application by a wife against her husband for alimony, although she does not ask for a decree of divorce."); *Taylor v. Taylor*, 108 Md. 129, 69 A. 632 (1908). The procedural orphan obviously remained in continuing good health after 1841 and did not hesitate to continue living on its own.

### The Alimony Act of 1980

By Chapter 575 of the Acts of 1980, the General Assembly of Maryland effected a sweeping restructuring of alimony law. In *McAlear v. McAlear*, 298 Md. 320, 344–45, 469 A.2d 1256 (1984), Judge Davidson explained that the 1980 Alimony Act represented a fresh legislative approach to the subject of alimony and was the culmination of a multi-year study by the Governor's Commission on Domestic Relations Laws.

*Maryland's 1980 Alimony Act* (1980 Alimony Act), Md. Code (1957, 1981 Repl.Vol.), Art. 16, §§ 1 through 5, *constitutes the second phase of a comprehensive revision of Maryland's domestic relations law.* It represents a new legislative approach to the rights and obligations associated with a form of spousal support—alimony. *The 1980 Alimony Act embodies a significant modification of the previous right to alimony for an indefinite period terminable upon*

the death of either spouse or the marriage of the recipient spouse. It allows equity courts to award alimony for a definite period of time after considering, among other things, both the monetary and nonmonetary contribution of the spouses, and any monetary award granted.

(Emphasis supplied).

The 1980 Alimony Act provided a comprehensive coverage that now embraces the entire field of alimony. *McAlear v. McAlear*, 298 Md. at 346, 469 A.2d 1256, stated:

> *The 1980 Alimony Act was passed for the purpose "of defining, consolidating and establishing the law with respect to alimony;* establishing uniform procedures for enforcing alimony obligations; clarifying language, resolving conflicts and defining certain terms; and relating generally to alimony." Ch. 575 of the Acts of 1980, effective 1 July 1980. The subtitle of [what is now Title 11 of the Family Law Article] is "Alimony."

(Emphasis supplied).

Judge Eyler noted in *Walter v. Walter*, 181 Md.App. at 281, 956 A.2d 255, the primary thrust of the new law.

> Ever since the adoption of the Maryland Alimony Act in 1980, alimony may be awarded either for a fixed term (often called rehabilitative alimony) or for an indefinite term. When alimony is awarded, the law prefers that the award be for a fixed term. The court has discretion, however, to award indefinite alimony in exceptional cases.

It is undisputed that the subject of alimony is now totally covered by statute. Before stating in *Turrisi v. Sanzaro*, 308 Md. at 525, 520 A.2d 1080, that "[t]here is no doubt that the alimony landscape is far different from what it was before the Alimony Act," Judge William Adkins commented on the now statutory character of alimony law:

> There is no doubt that the Alimony Act made major changes in the Maryland law of alimony. *Prior to its effective date, the standards for awarding alimony had been judicial rather than statutory. Now, those standards are*

*essentially statutory,* although many of the standards incorporate previous judicial rulings.

308 Md. at 524, 520 A.2d 1080 (emphasis supplied).

The Governor's Commission treated alimony, without express comment in that regard, as something necessarily associated with an actual divorce.

> [T]he Commission in various ways indicated that the purpose of the 1980 Alimony Act was to "provide the fairest possible outcome of *the alimony problem for most divorcing parties in this State.*" Report of The Governor's Comm'n on Domestic Relations Laws, at 2 (1980).

*Id.* (emphasis supplied). *McAlear v. McAlear* operated on the same unspoken assumption.

> The 1980 Alimony Act itself embodies a statutory scheme whose parts are logically organized to deal with *alimony upon the dissolution of a marriage.*

*Id.* (emphasis supplied). *Turrisi v. Sanzaro,* 308 Md. at 524–25, 520 A.2d 1080, similarly assumed a linkage between alimony and divorce:

> Thus, alimony was "not to provide a lifetime pension, but to facilitate *a transition for the parties from the joint married state to the separate single one.*"

(Emphasis supplied). And see *Hofmann v. Hofmann,* 50 Md.App. 240, 244, 437 A.2d 247 (1981) ("... the current duty by either spouse to pay alimony [was] to be statutory, as it now is."). The Report of the Governor's Commission similarly looked upon its mission as that of "attempt[ing] to frame a proposal that would provide the fairest possible outcome of *the alimony problem for most divorcing parties* in this State." (Emphasis supplied).

### The Procedural Predicates For Alimony

Concerned as it was with the reform of substituting rehabilitative alimony, where possible, for the former practice of providing indefinite alimony, the Report of the Governor's Commission had no occasion even to refer to the ancient Maryland procedure of applying for alimony without request-

ing a divorce. Without comment, the practice was left undisturbed. Section 11–101(a) lists the four situations in which a court may award alimony:

(a) *Where available.—the court may award alimony:*

(1) *on a bill of complaint for alimony;* or

(2) as a part of a decree that grants:

(i) an annulment;

(ii) a limited divorce; or

(iii) an absolute divorce.

(Emphasis supplied).

For present purposes we may forget the three launching pads for alimony awards listed in subsection (a)(2). There was in this case no decree of absolute divorce. There was no decree of limited divorce. There was no decree of annulment. In which respect, *see Moustafa v. Moustafa,* 166 Md.App. 391, 395, 888 A.2d 1230 (2005); *Ledvinka v. Ledvinka,* 154 Md.App. 420, 433–36, 840 A.2d 173 (2003); *Clayton v. Clayton,* 231 Md. 74, 188 A.2d 550 (1963). We are dealing exclusively with subsection (a)(1). What the Alimony Act of 1980 did, without so much as commenting upon it, was to preserve, like a fly in amber, the old and unusual Maryland procedure of applying for an award of alimony without requesting a divorce. For whatever unspoken reason, the Act chose not to disturb a long-standing habit. The language used by the Report of the Governor's Commission, III. Analysis of the Proposed Bill, A. Summary of Provisions, p. 9, made clear that the preservation of a hallowed procedure is precisely what the statutory language guaranteed:

The First Section authorizes the Court to award alimony in connection with a divorce or annulment *or in an action for alimony alone.*

(Emphasis supplied).

This Court took note of the preservation of a suit for alimony alone in *Walter v. Walter,* 181 Md.App. at 291, 956 A.2d 255:

Under the new Alimony Act, the circuit courts were granted *statutory authority to award alimony* either *on a complaint for alimony* or as part of a decree granting an annulment, a limited divorce, or an absolute divorce. FL § 11–101(a).

(Emphasis supplied).

## Sinking Into Desuetude

There is thus no doubt that the 300–year–old Maryland practice of petitioning for and receiving alimony without being granted a divorce survived the Alimony Act of 1980. The practical question remains, however, of How much, if any, vitality does the practice retain?

The burden of our analysis thus far has been to establish the symbiotic link between this unusual Maryland procedure of asking for alimony alone and a limited divorce (*a mensa et thoro*). Separate maintenance (alimony) historically went hand in hand with legal separation (an *a mensa* decree). But for the jurisdictional impediment before 1841, the two procedures in Maryland would undisputably have been treated as related aspects of a single proceeding, precisely as they were in the Ecclesiastical Courts of England. Even here, their fates would seem to remain closely linked. The intimate procedural relationship was well summarized in the Casenote, "Proper Venue of Suit for Alimony Without Divorce—Ouster of Jurisdiction—Amendment—*Woodcock v. Woodcock*," [3] 1 *Md. L. Rev.* 81, 82–83 (1936):

> [F]rom a realistic standpoint, *there is no essential difference between the granting of alimony without divorce and the granting of a divorce a mensa. They are similar in the five main essentials.* The spouses are not free to marry others. Their respective rights in each other's property are not affected. Support is awarded the wife if she is entitled to it. The living apart of the spouses is legalized, viz., it is judicially established that the defendant has committed

---

3. 169 Md. 40, 179 A. 826 (1935).

marital misconduct justifying the plaintiff in living separate from him. Further, the decree may be modified or set aside if subsequently occurring circumstances call for such action. Thus it is that, *given proper territorial jurisdiction, it is immaterial to a wife who wishes to obtain support and legalize her living apart from her husband* (without permitting him to remarry or losing her rights in his property) *whether she sues for partial divorce or alimony alone without divorce.*

(Emphasis supplied).

In the years since the promulgation of the Alimony Act of 1980, even limited divorce itself seems to be experiencing hard times. John F. Fader, II and Richard J. Gilbert, *Maryland Family Law* (3rd ed.2000), § 4–14(a), 4–51–52, observes:

The Court of Appeals has said that the policy of *the law of this state does not look with favor on limited divorces.* This is because *that type of a divorce is nothing more than a request for judicial permission to live separate and apart.* Such a request results in throwing the parties back upon society in indefinite and dangerous roles described by an eminent judge as "a wife without a husband and a husband without a wife."

*While some suits are filed today for a limited divorce* (formerly divorce *a mensa et thoro* ), *few are granted. Very few people really want a limited divorce rather than an absolute divorce.* Most of the suits for limited divorce are filed because a spouse seeking alimony does not yet have a cause of action available to her upon which an absolute divorce may be obtained. A suit for divorce is needed before alimony may be awarded. *The benefits of the Marital Property Act accompany only the granting of an absolute divorce.* Time passes, *the complaint for limited divorce is usually amended to a complaint for absolute divorce,* and the case goes to a trial or a hearing with an absolute divorce being granted. That is a usual scenario.

(Emphasis supplied). And see *Walter v. Walter,* 181 Md.App. at 289, 956 A.2d 255 ("[A] limited divorce ... does not end the

marriage. It is a divorce only 'from bed and board,' that is, a legal acknowledgment that the parties, although married, are living apart."); *Stecher v. Stecher,* 226 Md. 155, 159, 172 A.2d 515 (1961) ("[T]he decree awarding alimony without divorce ... is in effect a separate maintenance."); *Gellar v. Gellar,* 159 Md. 236, 241, 150 A. 717 (1930) ("application for divorce *a mensa et thoro* ... is practically nothing more than a request for judicial permission to live separate and apart.").

*Walter v. Walter,* 181 Md.App. at 293, 956 A.2d 255, observed that the role of the limited divorce may currently be one cast in a disappearing act:

> *Since 1980, there has been a dearth of published opinions in Maryland in which alimony was sought or granted incident to a limited divorce.* The likely reason is that, under the newly revised Alimony and Marital Property Acts, not only were the courts no longer authorized to make property distributions upon the grant of a limited divorce but also *the judicial decision-making about whether to award alimony, and if so, what form of alimony, became intertwined with the judicial decision-making about equitable distribution of marital property.* The statutory factors for each such award include consideration of whether the other award has or is being granted. Indeed, it is for that very reason that the cases are legion holding that, when a Maryland appellate court vacates an alimony award and remands the matter for further proceedings, it also should vacate any marital property award, and vice versa, as the two are inextricably linked.

(Emphasis supplied).

Just as Judge Eyler noted "a dearth of published opinions" since 1980 on alimony in connection with limited divorce, we have uncovered no published opinion since 1980 dealing with a complaint for alimony without any request for a divorce. The question inevitably arises as to whether the limited divorce and the request for alimony without divorce are not together

sinking slowly into desuetude.[4] If they are not yet anachronistic, they seem to be at least anachronescent.

Even if slipping off the radar screen, however, the procedure of requesting and receiving alimony without the granting of a divorce remains a legally viable one, and it was, therefore, available to the Wife in the case now before us. In terms of the abstract adequacy of the Wife's request for alimony, the fact that it was coupled with a counterclaim for divorce does not deny it the status it would enjoy if it had been filed as a claim for alimony without a request for divorce. She was still, of course, required to prove whatever she would have been required to prove on an alimony claim standing alone, neither more nor less. In *Hofmann v. Hofmann,* 50 Md.App. 240, 242, 437 A.2d 247 (1981), the wife filed a bill of complaint for alimony alone, without seeking a divorce. The husband filed a cross bill for a divorce *a mensa.* The 1977 hearing denied the divorce but nonetheless granted the wife her requested alimony.

The failure of the trial court to grant a decree of divorce to either the Wife or the Husband does not, *ipso facto,* bar the

---

**4.** Permitting one spouse to petition for alimony in this State without requesting a divorce will presumably always be appropriate in interstate domestic disputes, such as one wherein one spouse, without *in personam* jurisdiction over the other, has obtained an out-of-state divorce. *See, e.g., Wallace v. Wallace,* 290 Md. 265, 429 A.2d 232 (1981); *Altman v. Altman,* 282 Md. 483, 386 A.2d 766 (1978); *Dackman v. Dackman,* 252 Md. 331, 250 A.2d 60 (1969). *Wallace v. Wallace,* 290 Md. at 274, 429 A.2d 232, explained the anomaly:

> [R]espondent is placed in the awkward position of having to establish grounds for a divorce notwithstanding the fact that she has already been validly divorced from her husband on a non-culpatory ground, and even though, because of that adjudication, *she is not in actuality able to obtain a divorce from the Maryland court.* And it is the hypothetical nature of the query here which requires our continuous use of the conditional mood and past perfect tense when referring to the evidentiary burden which Mrs. Wallace shouldered in this case. *That she cannot in fact obtain a divorce,* however, *does not, by itself, defeat her claim for alimony,* for while *this State's law* requires that she show grounds for a divorce, it *does not compel her either to actually obtain one in this State or to prove that she in fact could have obtained one if she so desired.*

(Emphasis supplied).

Wife's alimony claim. On the other hand, the reason why a decree is not issued in the Wife's favor may, indeed, be absolutely fatal to her alimony claim (an issue which we must now examine), but the mere absence of a formal decree *per* se is not fatal. On a Wife's claim for alimony, 1) the denial of her request for divorce and 2) the reason for that denial may have diametric impacts. It is the reason for the denial, not the formal denial itself, that is controlling. In the case now before us, even after the divorces were denied, the Wife's request for alimony remained a viable one, provided only that she satisfy the requirements for such a grant. We now turn to the issue of whether she did so.

### The Requirements For an Alimony Award Without Divorce

Judicial accession to a request for alimony standing alone is not now, and never has been, automatic. Indeed, the difference between the practice in the Ecclesiastical Courts of England and the practice in the equity courts of Maryland, especially before 1841, was never as gaping as it may have appeared to be on the surface. Notwithstanding the prominence of the disconnect in Maryland practice between alimony and divorce, there was between the two always a countervailing shadow connection. An award of alimony did not depend on a grant of divorce or even a request for divorce, because it could not. An award of alimony did most definitely depend, however, on the petitioner's proof of factual circumstances that would have justified the Maryland court in granting a divorce, if it had possessed the power to do so. From the beginning, the Maryland courts, unable (and later not always required) to adjudicate a divorce case, nonetheless treated an alimony case as if it were a divorce case. The courts thus adjudicated indirectly what they could not adjudicate directly. That indirection was once necessary; it no longer is.[5]

---

**5.** To be able to do the same thing two different ways, either directly or indirectly, is an obvious affront to Occam's Razor.

■ The disconnect was, and still is, that a divorce itself need neither be granted nor even requested. The countervailing shadow connection is that a solid basis for divorce in favor of the alimony recipient must nonetheless be proved. This remains true under the Alimony Statute of 1980, as this Court announced in *Walter v. Walter,* 181 Md.App. at 291, 956 A.2d 255:

> The Court of Appeals subsequently held, *under the alimony statute,* that, to obtain alimony, a *spouse must be able to show facts that would entitle him or her to an absolute or limited divorce, even if a divorce were not being sought.*

(Emphasis supplied). The Court of Appeals spoke to the same effect in *Turrisi v. Sanzaro,* 308 Md. at 528, 520 A.2d 1080:

> [I]n Maryland, *the power to award permanent alimony* ordinarily *existed only if the claimant could show grounds for* either a limited or absolute *divorce. The Alimony Act has not changed this rule* so far as definite or indefinite alimony is concerned. *If,* therefore, *a party does not make this showing, he or she is not entitled to alimony.*

(Emphasis supplied).

The Court of Appeals in *Bender v. Bender,* 282 Md. at 527, 386 A.2d 772, similarly held:

> [W]e are without authority to change *the statutory provisions controlling the award of alimony,* which, as interpreted in an unbroken line of decisions by this Court, *permit such an award only when the spouse requesting it can establish that he or she has grounds sufficient to support a decree of divorce,* either *a mensa* or *a vinculo.*

(Emphasis supplied).

With specific reference to a request for alimony alone, Judge Smith announced in *Blumenthal v. Blumenthal,* 258 Md. at 539, 266 A.2d 337:

> *Courts of equity have inherent power,* independent of authority to grant a divorce, *to* entertain and *grant an application* by a wife against her husband *for alimony* where he is at fault. *It is necessary* in such case *that facts be shown*

*which would entitle the wife to a divorce a vinculo or a mensa.*

(Emphasis supplied).

The same message had consistently been iterated and reiterated through the 1950's and 60's. See *Wathen v. Wathen,* 245 Md. 684, 686–87, 226 A.2d 350 (1967) ("Equity has jurisdiction to decree the payment of separate maintenance to a wife although she does not ask for a decree of divorce. *Separate maintenance can only be allowed upon such allegations and proof as would justify the granting of a divorce,* either *a vinculo matrimonii or a mensa et thoro.*") (Emphasis supplied); *Courson v. Courson,* 213 Md. at 186, 129 A.2d 917 (1957) ("[I]n a suit for alimony alone, the wife must allege and prove facts sufficient in themselves to support a decree for a divorce *a mensa* or *a vinculo.* In other words, *in order that she be entitled to alimony, she must show she is entitled* to either a partial or an absolute *divorce.*") (Emphasis supplied); *Hull v. Hull,* 201 Md. at 232, 93 A.2d 536 (1953) ("The law is well settled in this State that a decree for permanent alimony may be granted upon grounds sufficient to support a decree for divorce.").

That refrain had, in turn, been picked up from the 1920's and 30's. See *Winkel v. Winkel,* 176 Md. 167, 169–70, 4 A.2d 128 (1939) ("In this State a decree for alimony may be passed without the granting of a divorce, but in order to entitle a wife to such an allowance the facts in the case must be such as would entitle her to either a divorce *a vinculo matrimonii* or *a mensa et thoro,* and *the court allowing alimony can only do so upon such allegations and proof as would justify a granting of a divorce.*") (Emphasis supplied); *Staub v. Staub,* 170 Md. 202, 208, 183 A. 605 (1936) ("In addition to awarding alimony in connection with the two classes of divorce, [the courts] may also award it to a wife upon allegation and proof of facts sufficient in themselves to support either a decree *a mensa* or *a vinculo.*"); *Hood v. Hood,* 138 Md. 355, 361, 113 A. 895 (1921) ("In this State a wife can sue for alimony, although she does not ask for a divorce, but when the allegations of the bill of complaint are insufficient to support either form of

divorce, they are insufficient to support a bill for alimony alone.").

Thus it was in the halcyon days before World War I as well. See *Polley v. Polley*, 128 Md. 60, 62, 97 A. 526 (1916) ("It is well settled ... that where the allegations of a bill of complaint are sufficient to support a decree for a divorce, they would be sufficient upon proof also to support a bill for alimony alone, but that *alimony alone can only be granted upon grounds sufficient to justify a divorce.*") (Emphasis supplied); *Outlaw v. Outlaw*, 118 Md. 498, 502–03, 84 A. 383 (1912); *McCaddin v. McCaddin*, 116 Md. 567, 82 A. 554 (1911).

Leaping backward over most of the 19th Century, we note that Chancellor Bland was pointing in 1830 to the indispensable linkage between a grant of alimony alone and the proof of circumstances that would justify the granting of a divorce *a mensa*, as he stated in *Helms v. Franciscus*, 2 Bland 544, 565 (Md.Chanc.1830):

> "According to the provision of this Act [of 1777], *[the Court] can not allow itself to receive any matter as a sufficient ground for granting alimony alone, which would not be a sufficient foundation* in England *for granting a divorce a mensa et thoro* together with its incident alimony."

(Emphasis supplied).

The shadow connection has always been there. If this Maryland practice of qualifying for alimony without receiving or even requesting a divorce but nonetheless being required to prove a case for divorce appears to be unusual, it is because it unquestionably is unusual. Although the practice may have acquired other peripheral or incidental utilities over the centuries, it was first and foremost Maryland's response to an unusual jurisdictional impediment that disappeared in 1841. The oddity is that the solution has now outlived the problem by 168 years.

### Tilting the Scales

One interesting, but little noted, difference emerges between an alimony award in the absence of a divorce (or

annulment) decree and an alimony award attendant on such a decree. From the perspective of the spouse seeking alimony, the odds favoring success are significantly more promising with a decree than without one. To obtain alimony without a decree, a spouse must prove a case that would on the marital merits entitle that spouse to a decree in his or her favor. When a decree is actually awarded, by contrast, a needy spouse may receive alimony even if the marital merits run exclusively in the opposite direction. As *Caccamise v. Caccamise*, 130 Md.App. 505, 514, 747 A.2d 221 (2000), put it:

> Clearly *a trial court*, in the exercise of its judgment, after considering the factors listed in Md.Code, Fam. L. § 11–106, *may award alimony to a "guilty" party.*

(Emphasis supplied). The applicant for alimony without a decree enjoys no such luxury of behavioral options.

## The Wife's Failure to Prove A Case

██ The failure of the trial judge in this case to issue a decree of divorce did not, *ipso facto,* invalidate the Wife's request for alimony. To prevail, however, the Wife was still required to prove a case that would have entitled her to divorce, either limited or absolute. As the very opposite of Portia's quality of mercy, the Wife's proof in this regard was "twice curst." Even had her case for divorce been otherwise impeccable, it lacked legally required corroboration. Even corroboration would have been a meaningless afterthought in this case, however, in that there was nothing to corroborate.

## The Corroboration Requirement

Even in a world of no-fault divorce based on a mutually voluntary separation, the corroboration requirement retains much of its historic potency. Family Law Article, § 7–101(b) unequivocally states:

> A court may not enter a decree of divorce on the uncorroborated testimony of the party who is seeking the divorce.

In *Leary v. Leary*, 97 Md.App. 26, 33–34, 627 A.2d 30 (1993), this Court addressed the corroboration requirement in the context of voluntary separation.

Parties can agree to separate voluntarily and, *if the agreement is executed under oath before the complaint for divorce is filed, that agreement is full corroboration of the plaintiff's testimony that the separation was voluntary.* Md. Fam. Law Code Ann. § 8–104 (1984, 1991 Repl.Vol.). In the instant case, while neither party saw fit to include the "agreement" resolving the divorce issue referred to by the trial judge, we did locate a stipulation dated May 7, 1992 in the transcript of the record. That stipulation does not, however, remotely relate to the grounds for divorce.

Despite § 8–104, *the court may not grant a divorce based simply upon the agreement of the parties. Dougherty v. Dougherty,* 187 Md. 21, 29–30, 48 A.2d 451 (1946). *The plaintiff must testify,* Md. Fam. Law Code Ann. § 1–203(c) (1984), 1991 Repl.Vol., *and that testimony must be corroborated.* Md. Fam. Law Code Ann. § 7–101(b) (1984, 1991 Repl Vol.). *The court cannot simply allow the parties to agree to divorce.*

(Emphasis supplied).

In this case there was no voluntary separation agreement within the contemplation of § 8–104. Both the Husband and the Wife acknowledged that they had no corroborating witnesses or other corroborating evidence. Indeed, no witnesses were called other than the parties themselves.

Lest there be any thought that a case for alimony alone might not require corroboration even though a decree of actual divorce itself would require such corroboration, *Roeder v. Roeder,* 170 Md. 579, 185 A. 458 (1936), dispels any such doubt. The wife in that case sought and received alimony alone. The Court of Appeals made it clear that the case for alimony would be scrutinized exactly as would a case for divorce itself:

In this case *the allegations* of the bill, *in order to support a demand for alimony or separate maintenance, there being*

*no prayer for divorce, must be such as would entitle the plaintiff to a divorce a mensa et thoro, if such relief had been prayed,* and these allegations must be supported by a clear preponderance of evidence.

This being the rule, *it is our duty to consider the facts and to determine whether they are sufficient to establish the right of the appellee to a divorce a mensa et thoro.*

170 Md. at 581, 185 A. 458 (emphasis supplied). On the issue of corroboration, the Court of Appeals was very clear:

Thus it will be seen that, *where permanent alimony is sought, the same requirements as to proof, including corroboration, are necessary as where divorce a mensa et thoro or a vinculo is sought.*

*Id.* at 585, 185 A. 458 (emphasis supplied).

The opinion in *Roeder* quoted with approval from the earlier decision in *Silverberg v. Silverberg,* 148 Md. 682, 130 A. 325 (1925). That opinion stated unequivocally:

In the determination of the issue of fact, *the wife must bear not only the usual burden of proof* which rests upon the proponent of a fact, *but also the obligation imposed by the statute that her own testimony will not be sufficient without corroboration.* And the testimony must be sufficient to prove such facts as would have entitled her to a decree for divorce either *a vinculo* or *a mensa et thoro.*

*Id.* at 690–91, 130 A. 325 (emphasis supplied). See also *Heinmuller v. Heinmuller,* 133 Md. 491, 494–95, 105 A. 745 (1919).

### There Was Nothing to Corroborate

Corroboration, moreover, cannot exist in a vacuum. In this case, there was nothing to corroborate. Supporting testimony is a floating and meaningless abstraction in the absence of something to support. The Wife was required to prove a case that would have justified granting a divorce to her. Her counter-complaint asserted two grounds for divorce: 1) adultery and 2) abandonment. She gave no testimony that estab-

lished either of those ostensible grounds for divorce. It is impossible to corroborate nothing.

We fully agree, therefore, with the Husband's first contention that no basis was established to support an award of alimony to the Wife. Accordingly, we will vacate that part of the court's order awarding alimony to the Wife.

## The Second Contention

The Husband's second contention is:

The order of remand in this case should require the trial court to consider recoupment by Mr. Cruz of the alimony erroneously awarded to Ms. Silva.

It is not appropriate for us to require the trial judge on remand to take any particular action with respect to the recoupment of alimony payments. We do not know, for instance, whether any payments, in full or in part, have actually been made. The Husband is, in effect, asking us to declare that any alimony paid by him to the Wife pursuant to the now vacated alimony award be declared a debt owed by her to him.

It is not for us to engage in rank speculation. There has been no divorce in this case. The Husband and the Wife, like it or not, are still husband and wife. For all we know, they may reconcile and settle their financial squabbles amicably and privately. If not, further legal proceedings will undoubtedly be forthcoming. The time has not yet arrived for any final balancing of the books, should such a balancing even be necessary.

## Child Support

■ The vacating of the alimony award will also necessitate a vacating of the child support award. As an almost inevitable consequence of both the Husband and the Wife having proceeded *pro se,* the testimony to support a calculation of child support was thin to the point of being vaporous. There were no income tax returns or W–2 forms or employment records of any sort. At one point the Husband testified that he earned

$900 a week, but that testimony was deemed to be not credible. The trial judge accepted a figure of $1,200 per week, based on the testimony of the Wife that on one occasion approximately three years earlier she had taken her husband's salary check to the bank and the check was for $1,200. The court accepted the Wife's testimony that she has been, in compliance with the Husband's wishes, a full-time caretaker for the children and has not worked for three or four years.

The Wife's income of nothing was, in the calculations, increased to one of $1,500 per month based exclusively on the alimony award. The Husband's income, based upon the appropriate multiplication of $1,200 per week was conversely reduced by the $1,500 per month alimony payment. The trial judge explained her computation.

> Looking, then, at the child support and employing the figures father earning 1200 a week or 5,096 per month and paying alimony of 1500 per month his monthly adjusted actual income is 3,696. Mother's income at this point is then 1,500.... [A]ccordingly, pursuant to the Maryland Child Support Guidelines, Mr. Cruz Perez' child support obligation for the two minor children is 764 per month.

The alimony award was obviously a major factor in that computation. On remand, it will have to be factored out. Hopefully, with the possible assistance of counsel, more fully documented information may take its place.

**BOTH ALIMONY AWARD AND CHILD SUPPORT AWARD VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEE.**